GRANVILLE NAT CORDELL, Plaintiff in Error,

*v.*

STATE, Defendant in Error.

(*Knoxville*, September Term (May Session), 1959.)

Opinion filed September 9, 1960.

STREET, BANKS & MERRYMAN, Elizabethton, for plaintiff in error.

THOMAS E. Fox, Assistant Attorney General, for the State.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

Plaintiff in error Granville Nat Cordell, hereinafter called the defendant, was convicted of murder in the second degree and sentenced to serve not less than 10 nor more than 15 years in the State Penitentiary.

On appeal there are 5 assignments of error, the first of which relates to the sufficiency of the evidence and the second asserts that the verdict evidences passion, prejudice and caprice on the part of the jury. These will be discussed very briefly together.

On May 24, 1958, about dusk, the defendant shot and killed one Scott Lambert with a 12-gauge shotgun loaded with buckshot, the shot striking the victim near the pit of the stomach. He expired very shortly thereafter.

These two men with their families lived about a quarter of a mile apart in the mountain section of Carter County about a mile and a half from the North Carolina line in the area of Banner Elk. The defendant's residence is a small house with either 3 or 4 rooms in the rear one of which he has a very limited stock of merchandise consisting mainly of soft drinks and knickknacks. There are two doors, front and rear of the building. It is a typical mountain cabin in which the defendant, his wife and 7 children were living at the time. On the day of the tragedy, and, according to some of the defense witnesses, and on the preceding night, one of the daughters of the deceased was visiting at the home of the defendant. This girl was 13 years old at the time and there is testimony that the defendant gave beer to her and another girl about the same age who were visiting his daughter of like age. In any event, very shortly before the tragedy, the deceased unarmed came into the rear door looking for this daughter of his; she ran out the door yelling for help and crying that her father would whip her or kill her or something to that effect, but in any event, indicating that she was afraid. Her father chased her down a side lane for a short distance until she managed to elude him. As he was returning to the main road that passes by the defendant's place of business and home, he observed the defendant coming towards him with this shotgun in his hand. The defendant had picked up his gun and gone out immediately after deceased and his daughter had run away from the house. As the two men approached one another, the deceased said, ''What are you doing with that gun'', and with that the defendant shot him.

The defendant's insistence was that it was an accident and would not have happened if this deceased had not continued to approach him after he had ordered him 2 or 3 times to stop and then caught hold of the barrel of the shotgun and tried to take it way from him; that he did not aim the gun or pull the trigger but the gun went off accidentally.

The trouble about that claim of accident is that the defendant is contradicted by all of the eye witnesses including one Lloyd Vines; nobody supports any theory that the deceased caught hold of the gun or that the two men were close enough together to engage in personal contact or struggle. Not only that but there is testimony that when defendant picked up his gun and started to leave the house, he stated that he was going to kill the so-and-so; Libby Potter testified in response to a question by him to the defendant that the defendant replied, "I guess I did, I shot him with buckshot and aimed at his center." Then the sheriff testified that they made some pattern tests with this shotgun and other guns and that when the shot pattern of this gun was compared to the pattern of the shot in the body of deceased, the indication or conclusion to be drawn was that the gun was fired at a distance of from 6 to 12 feet from the victim.

█ Without further detail, our examination of the testimony shows that the defendant was contradicted by a number of witnesses in practically every material statement that he made. Under these circumstances, there is certainly only one conclusion and that is that the preponderance of the evidence is not only not in favor of the innocence of the defendant but is definitely against any theory of innocence. It was a most useless and cold

homicide and the jury, in our opinion, dealt leniently with the man. Accordingly, both of these assignments are overruled.

The third assignment is that the court erred in admitting an alleged confession by the defendant to the sheriff when he was asked by the latter to tell him what happened, without the sheriff having first advised him of his constitutional rights, and that whatever he said might be used against him in the trial.

Counsel for defendant cites *Giles v. State,* 185 Tenn. 429, 206 S.W.2d 412. This assignment is predicated on the fact that the sheriff, when the defendant surrendered to him, asked him what happened and the defendant undertook to tell him.

*Giles v. State,* supra, is not applicable for several reasons. First, that case was based upon T.C.A. sec. 40-1101 which makes it the duty of the *magistrate* to inform a party brought before him of his rights. Second, the squire testified that the defendant in that case did not voluntarily make the statement of the details of the homicide but that the statement was elicited from him by the questioning of the squire, and that because of the personal acquaintance and friendship existing between them the defendant told his story to the squire as a friend rather than as a magistrate. Third, the statute has no application to anyone other than a magistrate.

In *Hickson v. State,* 196 Tenn. 659, 664, 665, 270 S.W.2d 313, we *Held* that no such duty rests upon the attorney general. In that case the attorney general went to the third floor of the jail and asked the prisoner whether he was the same person who had been convicted of 3 other offenses, without stating that he would be indicted as an

habitual criminal or without stating for what purpose he asked the question. There was no evidence of any hope or fear offered as an inducement for the defendant to speak. We said also that, apart from the statutory requirements, a failure to warn does not render a confession inadmissible or involuntary, but is a circumstance to be taken into account by the judge in exercising his discretion whether to exclude the statement.

If, therefore, the trial judge finds that the evidence shows the statement to be voluntary, there is no reason why it should not be admitted in evidence. This assignment is overruled.

■ The fourth assignment complains of this part of the charge of the court: ''The law makes it the duty of the court to give in charge to the jury the law relative to the case on trial; and of the jury to carefully consider all the evidence delivered to them on the trial, and under the law given them by the court, render their verdict with absolute impartiality.''

In our judgment, this is a perfectly proper charge. Counsel seeks to mesh this language into that in the case of *Dykes v. State,* 201 Tenn. 65, 296 S.W.2d 861, 862. There the language was, ''You * * * are the sole judges of the evidence and * * *, but the law you will take as given you by the Court.''

That charge was a mandatory direction to the jury that they were the sole judges of the evidence but to the contrary, they are not the judges of the law. Funk & Wagnalls Dictionary defines thus: ''But conj. * * * has many and varied uses, so that it is often difficult or impossible to decide whether the word is a conjunction, a preposition, an adverb, or a particle having various

offices. As the typical word used in the *adversative* co-ordination of sentences, but expresses fundamentally *opposition, exception* or *exclusion,* but its meaning is often restricted to slight transition or simple continuance." (Emphasis ours.)

See also Webster's Unabridged Dictionary.

Accordingly, it is plain that the two parts of the sentence in the Dykes case are in opposition to one another. On the other hand, in the present case there is no such mandatory language. It is (1) the duty of the court to give in charge to the jury the law relative to the case; (2) the duty of the jury to consider carefully all the evidence; (3) to consider it under the law as given them by the court; if not, why charge the law at all; and (4) actually the charge is exactly in accord with the charge approved in *Ford v. State,* 101 Tenn. 454, 461 and 462, 47 S.W. 703.

This assignment is overruled.

■ The 5th and last assignment complains of the following statement by one of the prosecuting attorneys to a State's witness. The witness had just testified that he had followed the deceased on out of sight when he was asked and answered as follows:

"Q. And then sometime after, did you hear anything unusual? A. I heard a gun go off.

"Q. You heard a gun go off? A. And I heard a man go to holloing.

"Q. You heard a man hollering? Shot down like a dog.

"Mr. Street: We object to that.

"The Court: Sustained.

"Mr. Laws: I will withdraw that.

"The Court: You will disregard that, Ladies and Gentlemen.

"Mr. Street: We ask for a mistrial.

"The Court: Well, overruled."

We think there is no merit to this assignment for two reasons. One is that the trial judge immediately told the jury to disregard the statement, and the other is that there is considerable evidence that supports this suggested question of the attorney general. We think there is no merit in the assignment.

All assignments are overruled and the judgment below affirmed.

ADDENDUM. The Court commends Mr. Mathes, the Clerk of the Circuit Court, for the format of the transcript, especially the binding and indexing; the index of the technical record is on page one and that of the bill of exceptions on page two of the transcript and each is arranged alphabetically as to person or subject matter.