Henry Clay Monts and Johnnie West,
Plaintiffs in Error.

*v.*

State of Tennessee, Defendant in Error.

400 S.W.2d 722.

(*Jackson,* April Term, 1965.)

Opinion filed March 2, 1966.

32

HUGH STANTON, Public Defender, Memphis, for Johnnie West.

ROBERT A. TILLMAN, Assistant Public Defender, Memphis, for Henry Clay Monts.

GEORGE F. McCANLESS, Attorney General, and THOMAS E. Fox, Assistant Attorney General, Nashville, for defendant-in-error.

34

MR. JUSTICE WHITE delivered the opinion of the Court.

Henry Clay Monts and Johnnie West, plaintiffs in error here, were indicted, tried and convicted for murder in the first degree in the perpetration of a burglary, and were sentenced to serve 150 years each in the State Penitentiary. Their motion for a new trial having been overruled, they have appealed and have assigned errors in one joint brief filed on their behalf by the Public Defender of Shelby County, the Honorable Hugh Stanton, appearing on behalf of West, and by his Assistant, the Honorable Robert A. Tillman, appearing as counsel for Monts.

At the outset, we observe that these cases have been before this Court on a prior occasion and were reversed because of the failure of the trial judge to instruct on the law of circumstantial evidence as requested by counsel for Monts and West. The decision is in 214 Tenn. 171, 379 S.W.2d 34 (1964). In that case these plaintiffs in error were found guilty and their punishment fixed at death by electrocution. A third defendant in that case, Joel Olds did not appeal his conviction and sentence to serve 99 years in the State Penitentiary. Olds confessed his guilt and implicated his co-defendants, West and Monts, as principals in the burglary and the murder hereinafter detailed. The confession of Monts was admitted in the prior trial and also in this trial over objection of counsel.

Upon the facts appearing in that record, we held the confession of Monts admissible in evidence. *Monts et al. v. State,* supra.

The first assignment of error here is in three parts: (1) there is no evidence to sustain the verdict of the jury; (2) the verdict of the jury is contrary to the law and the evidence; and (3) the evidence preponderates against the verdict of the jury.

 In considering this assignment, we do so upon the well established law of this State that a conviction in a criminal case will not be reversed on the facts unless it is shown that the evidence preponderates against the verdict and in favor of the innocence of the accused, and the burden is upon the plaintiff in error to make this showing. Stated another way, the presumption of innocence disappears upon conviction in the lower court and is displaced by a presumption of guilt, and it is with this presumption that we consider the case on appeal. *McBee v. State,* 213 Tenn. 15, 372 S.W.2d 173 (1963); *White v. State,* 210 Tenn. 78, 84, 356 S.W.2d 411, 414 (1962), and many other cases.

Assignment of error number two is that the court erred in refusing to sustain the petition to sever and grant the defendants a separate trial.

Assignment of error number three is that the court erred in permitting the statement alleged to have been given by Henry Clay Monts to Inspector E. C. Swann, to be introduced in evidence.

The said statement was highly prejudicial both to the defendant, Henry Clay Monts, and to the defendant, Johnnie West; the admission of same was a fatal error,

and, therefore, the verdict of the jury should be set aside.

Assignment of error number four complains of the action of the court in admitting the testimony of the witness, Granville Allison, over the objection of the defendants.

Assignment of error number five is that the court erred in admitting the testimony of the witness, Dennis Mallick, over the objection of the defendants.

The final assignment of error, number six, is that the court erred in failing to charge the jury specifically that unless the jury was convinced of the voluntariness of the confession of the defendant Monts, beyond a reasonable doubt, then the jury should not consider the confession of the defendant Monts for any purpose whatsoever.

As indicated above, we have re-read our prior opinion delivered when this case was before us on the earlier appeal and we find that the facts presented to the jury in that case and in the present case are substantially the same except for the absence of the testimony of one Clarence McCord, who shared a cell in the Shelby County Jail with the Defendant West and he gave certain testimony against West which is not now present in the record and, therefore, we give it no consideration.

The facts appearing in this record are fairly set forth in the briefs filed on behalf of the plaintiffs in error and the State. From these briefs, together with the record, it appears that James M. Toombs called the Memphis Police Department at about 12:50 o'clock, A.M., on October 7, 1960 and reported that a burglary was being committed at or in Ace Sundry Store on the southeast

corner of Orleans and McLemore Avenues, in that city. Within a few minutes thereafter, Memphis Police Squad Car No. 25 containing Officers Bruno and Pierini arrived on the scene. Toombs informed them that glass had been broken and suspicious noises had come from Ace Sundry Store.

Officer Bruno proceeded immediately to investigate the cause of the disturbance and entered the Sundry Store through a broken glass opening in the front door. Officer Pierini continued to get detailed information from the witness Toombs, but when they heard two shots fired from in or near the store and saw a man fleeing from the store south on Orleans Avenue, Pierini and the witness hastened to the store where they found Officer Frank Bruno lying on a terrace with his legs and feet on the sidewalk. His flashlight and pistol were on the sidewalk nearby. He was badly wounded and could make no statement. Mr. Bruno died at the Methodist Hospital while supreme efforts were being made to preserve his life.

Officer Pierini reported to the Police Dispatcher that Officer Bruno had been shot and immediately thereafter squad cars were dispatched to the area and a careful search was made of the premises, that is, the Ace Sundry Store, and the surrounding area for suspects. None were found.

The defendant, West, was arrested at 7:30 o'clock, P.M., October 8, 1960, on a complaint filed by a taxi driver that he had refused to pay his bill of $2.75, when West contended that the fare should have been only $1.25. When the taxi driver threatened to call the police West told him to do so and that they would wait for their arrival. West was drunk at the time and on the way to

the police station he told a policeman that he had something on his mind that would put him away for a long time if it was known.

He was then questioned at the station about the Bruno killing, but was released subject to the action of the City Court for disorderly conduct and for public drunkenness. He was fined on both charges and sent to the County Workhouse, where he arrived on October 11, 1960, and stayed until his fine was worked out or paid.

The plaintiff in error, Henry Clay Monts, was arrested October 11, 1960 and questioned by the police about the killing of Officer Bruno. He was released on the same day of his arrest.

On September 22, 1962, West was again arrested at the State Penitentiary in Nashville where he was serving a sentence for conviction on a charge of robbery. He was transported to Memphis on the evening of September 22, 1962, and was questioned in the Homicide Office of the Police Department. On the trip from Nashville to Memphis West stated that he could not have been involved in the Bruno killing because he was at that time serving a sentence in Shelby County. This was false according to the official records.

Prior to the return of West to Memphis, one Joel Farris Olds, together with three women, Trudy Carroll, Mildred Barber, and Christine Clark had given statements to the Police about the killing of Officer Bruno and implicated West.

After the arrival of West in Memphis, Inspector E. C. Swann played a taped recording of the statements of Olds, and the three women named, in order that West might hear what they had to say. These four parties were

brought into the presence of West and made their statements in person before him. On both occasions he protested his innocence and claimed that he was being framed and that the statements made by these witnesses were false.

The record shows that Trudy Carroll served a short sentence for being an accessory after the fact of the murder of Officer Bruno. Her testimony will be referred to again in this opinion.

Christine Clark, at the time of the present trial, was confined as a mental patient in the State Institution at Bolivar, Tennessee, and, of course, did not testify.

On September 25, 1962, Monts was arrested in the City of Chicago, and after waiving extradition was brought to Memphis on September 26, 1962, arriving there at about 9:30 o'clock, P.M. Upon his arrival in the Memphis Police Department he was questioned by Inspector Swann for about three hours, and during this time the tape recordings of the voices of Olds, Trudy Carroll, Christine Clark and Mildred Barber, were played to him and he recognized their voices. It took about forty-five minutes to play these tapes all the way through and they were played several times. Monts was questioned about these statements and about his part in the burglary and the killing of Officer Bruno.

Monts admitted his participation and at about 12:45 o'clock, A.M., on September 27, 1962, a written statement was taken from him, consisting of thirteen pages. At the beginning of the first page appears this statement which Captain Swann, now Inspector Swann, said that he read to Monts:

Monts, you are under arrest and will be charged with *MURDER,* this charge growing out of the fatal shooting of *FRANK BRUNO,* Male White, who was employed by the Memphis Police Department on October 7, 1960 at approximately 1:00 A.M. Bruno was investigating the burglary of the Ace Sundry Store, at 639 East McLemore, when he surprised you and Johnnie West, at which time he was fatally wounded and did expire of said wound on the morning of October 7, 1960 at approximately 1:30 A.M. It is my duty as an officer to inform you that any statement made by you at this time can and will be used as evidence against you at the time of trial in court. With this understanding do you care to make a statement and will you answer the questions that I will ask you truthfully and to the best of your knowledge?

Monts said that he would answer truthfully and there appears a detailed statement of the participation of Monts, West and Olds in the burglary of some stores on the late evening of October 6, or the early morning of October 7, 1960, including the Ace Sundry Store, and in the death of Officer Bruno. Monts signed this statement with his full name, Henry Clay Monts, on the last page thereof, and initialed each of the preceding twelve pages. West was not present when this statement was given.

The summary of the evidence, in addition to that above referred to, appears in the brief of the State, which we now refer to, and the evidence as summarized by the plaintiffs in error will then be detailed.

The plaintiffs in error and Joel Farris Olds were together on the date of October 6, 1960 in a restaurant located at 271 Poplar Street, Memphis, Tennessee, from

about 10:30 P.M. to a little after 11:00 P.M. A waitress and part-owner of the restaurant, Trudy Carroll, testifying as a State's witness said that she overheard the three of them plan the burglary of the Ace Sundry Store before leaving the restaurant shortly after 11:00 o'clock, P.M. They were drinking at that time, but were not drunk.

Later that night, or at about 2:00 A.M., on the following morning, Christine Clark and Mildred Barber, who were friends of the plaintiffs in error, as well as friends of Trudy Carroll, came to the restaurant shortly after closing time and upon their insistence they were permitted to enter. After talking to these two women, Trudy Carroll obtained some mercurochrome and went with them to the home of Christine Clark's parents, a Mr. and Mrs. Anderson, and doctored Monts who had a wound on his right side about one inch or two inches wide, and two or three inches long, which "looked more like a burn than a stab."

Monts stated to Carroll that he could not go to the doctor because of the police. While she was there Monts told her that there were seven or eight people involved in the matter and asked her to stay out of it. About two days later, on October 8, 1960, she went back to the Anderson home to "doctor Red Monts" and he admonished her again, "I told you to stay out of this." In the discussion which followed Monts asked Carroll if she was a friend of Officer Bruno and then related to the witness some of the details relative to his getting shot during the robbery, adding that he did not know too much about it because he was drunk. He also told the witness that Joel Olds got a gun up the street, meaning up the street from the Ace Sundry Store.

It was testified on the trial that West

\* \* \* told Christine that if she didn't tell the boys that he had been with her all day and all night, and all day the next day before, that they would hang him for what happened and Christine said: "I can't. I've done made my statement, and I have told the truth and don't matter who it hurts or what happens."

West denied any such statement.

As said in the State's brief, there is evidence in the record that Trudy Carroll had employed counsel to assist her in obtaining a reward of $16,000.00 offered for the arrest and conviction of those responsible for the death of Officer Bruno.

On September 23, 1962, Defendant West, being still in jail, sent a trusty, James Crawford, to deliver a message to Joel Olds who was in the jail at the same time but in a different cell, or a different area. The first message sent to Olds by West, through Crawford, was: "What's the deal?", and the second message was: "Don't plead guilty and don't tell nobody nothing."

Another witness who was in jail when West was brought there on the night of October 8, 1960 said that West said that he was in jail at the time, on October 8, 1960, "for killing a cop." Of course, this was not the charge at that time. The charge was merely being drunk and disorderly and we doubt that the jury gave any weight to this statement.

The State's brief contends there are many circumstances tending to corroborate the evidence just recited, including the fact that a man ran from the area of the Ace Sundry Store shortly after two shots were fired in

that area. Officer Pierini fired four shots in the direction the man was running, but he could not tell whether the runner was a white person or a colored person.

A liquor store and grocery store on McLemore Street near the Ace Sundry Store, were burglarized during the night of the homicide in question. The liquor store at 739 McLemore Street and the grocery store at 735 McLemore, located about two blocks from the Ace Sundry Store were both burglarized. A .38 Smith & Wesson pistol and a box of .38 shells were taken from the grocery store.

A witness sleeping over the grocery store fixed the time of that burglary between 11:45 P.M. and 12:15 A.M. on the night of October 6. A bullet removed from Officer Bruno's body was found to be a .38 caliber bullet fired from a Smith & Wesson pistol, with five lands and grooves in the barrel, twisting in a right hand or clockwise direction, and manufactured by Western Winchester Ammunitions Company. Another slug was found in a cigar box in the Ace Sundry Store and it was a .38 caliber bullet fired from a Smith & Wesson pistol which had five lands and grooves, twisting in a right hand or clockwise direction.

The ballistics expert, a FBI agent, by the name of Robert A. Frayser, testified that he was unable to determine that the bullets were fired from the same weapon and further there were not sufficient markings about the slugs to warrant comparison to the suspected Smith & Wesson pistol, but he could say that the two slugs could have come from the same weapon. The hat identified as belonging to Joel Olds was found near the scene of the crime with the box of shells referred to above under it.

It, too, was examined by the FBI but nothing of value could be found according to the Special Agent, Robert E. Duckett.

Plaintiff in error Monts had several scars on his back, some of which have no pertinency to the present case, but when he was examined after his arrest in September, 1962, the Medical Examiner for Shelby County, Dr. Jerry Francisco, found a scar about one inch wide and four inches long and he says that it was of the type that would result from a laceration or tear. Monts told Dr. Francisco that it was the scar treated on the night after his return to the Anderson home.

Both of the plaintiffs in error testified in their own behalf. Monts admitted being in the restaurant operated by Trudy Carroll on the night of October 6, 1960, and admitted that he and the other two, West and Olds, had been drinking rather heavily for some time, but he insisted that Christine Clark and Mildred Barber were with them, and when they left the restaurant before 11:00 P.M., they went to the home of Christine Clark's mother and father, a Mr. and Mrs. Anderson, where they remained the entire night.

Monts then categorically denied the truth of the statements contained in his purported confession, although he admitted signing and initialing each page, but that he did this without reading the statement and without knowing its contents. This was the same position he took on the first trial. He also denied making a statement to Dr. Francisco on the day following his arrest, September, 1962, that he received treatment for an injury to his back on the night of the burglary and the death of Officer Bruno.

In the brief filed on behalf of Monts it is said that he was with West and Olds at 271 Poplar Avenue on October 6, 1960, between 10:30 and 11:00 o'clock, P.M., as related by the testimony of Trudy Carroll.

Trudy Carroll testified that around 2:00 A.M., on the same night, Mildred Barber and Christine Clark came to the restaurant and asked her to go and take some medicine to Monts, saying that he had been hurt. She went immediately and carried some mercurochrome with her to treat Monts' wound. She said that she talked to Monts and found that he had a wound one or two inches wide and two to three inches long, looked more like a burn than a stab, and said it was bloody and raw, and that his pants and shirt had blood stains on them.

There was other conversation between her and Monts on this occasion which has been referred to above. She then said that she saw Monts a second time, in the day time, and that she went there with a man named Charles L. Cullom, and with Mildred Barber. Cullum said that he went with Trudy Carroll and Mildred Barber to see Monts and that he saw a raw wound on Monts' back; that it had been bleeding, and that his conduct in going to the window and looking out aroused the suspicion of Cullom. He testified that he related the incident to police.

Mrs. Elvie Anderson said that Monts came to her house and stayed there some three or four days and during this time he was very sick. His stomach was upset and according to some witness he had a temperature. She saw no blood and no evidence of blood of any kind, and she stated that she had ample opportunity to observe him carefully because he went around the house without a shirt.

Mrs. Anderson said that Trudy Carroll never came to her house in the middle of the night, and that neither Christine Clark, her daughter, nor Mildred Barber ever brought Miss Carroll to her house, but that Trudy Carroll did come to her house in the day time after Monts had been there several days.

Monts claimed that the statement introduced as his confession was not voluntarily given, and, as a matter of fact, he denied the truth of it altogether. He denied that Inspector Swann advised him that the evidence in the confession could be used against him and he contended that Swann failed to tell him of his right to remain silent and not to testify at all, and further that no mention of right to counsel was ever made to him until 12:45 A.M. when the statement was about to be put in writing.

In this trial, but not on the prior trial, Monts said that he asked Inspector Swann to let him call his mother, that he wanted to talk to her about his son who had lost his life in an automobile accident a short time before. He also wanted to ask her to arrange to have a lawyer advise him.

Monts claims that his statement was involuntary because influenced by grief over the knowledge of the death of his son in an automobile accident as related to him by Inspector Swann. Inspector Swann says that Monts already knew of the death of his son and that Monts asked him if he knew something about his son being dead. Inspector Swann replied that he did and he had a clipping about it and he passed the clipping to Monts who read it. The death of his son had occurred three or four days before Monts' return to Memphis.

Inspector Swann was asked on cross-examination:

Q. And I will ask you if he didn't, Monts, then request and tell you that he was shook up about this thing [the death of his son], and that he would like to call his mother at Tupelo, Mississippi and also get hold of his brother so that his brother might secure an attorney for him because he was held on this serious charge?

A. He did not, sir.

Q. Never mentioned it?

A. No, sir.

Q. Never made any request of you to anybody?

A. No, sir, he did not.

Q. Did he tell you that he had worked all of the previous day and that he was kept up all of the—that night after his arrest with police authorities [in Chicago], he hadn't had any sleep, and wanted to rest?

A. He did not.

Q. He never told you that?

A. In fact, I asked him the question was he tired and he said he was not.

Based upon the testimony of plaintiff in error and Inspector Swann, and all of the surrounding circumstances, the trial judge determined that the written statement signed by Monts was given freely and voluntarily without threat of punishment or promise of reward. Based upon this ruling, he admitted into evidence with the charge given to the jury:

Gentlemen, the very reason I explained to you the other day, anything said in here by—allegedly said by the

defendant Monts in regard to the defendant West you will not consider that against West for any purpose whatsoever. You all understand that?

Jurors: Yes, sir.

The Court: All right.

This special charge was given to the jury at the time in response to the request of Mr. Stanton, counsel for West, in the following words:

If your Honor please, it is my understanding that West was not present when this statement was taken and I want to impress upon the jury this statement is not West's statement and West is not responsible for this statement and I would appreciate your Honor instructing the jury to that effect, that West is not in any sense chargeable with this statement.

It might be observed that there is no charge of coercion or maltreatment on the part of the police officials in obtaining this statement. On the contrary, Monts said that the police were nice to him.

The evidence relevant to the plaintiff in error, West, is fairly set out in the brief filed by counsel on his behalf and we will refer to it, except in those instances where it duplicates the evidence heretofore related.

Trudy Carroll identified Monts and West as having been in her restaurant at 271 Poplar Avenue on the evening of October 6, 1960, and said that they talked of being without money and a place where they could get some money. She heard some one mention the Tri-State Amusement Company and Monts objected because he was under suspicion of breaking in one of its juke boxes and then she heard him suggest Ace Sundry Store, but then

she heard him say: "I have no gun." She said that she had never seen these men before, but that they left the restaurant at about 11:00 P.M. on the night of October 6, 1960, and she fixes this time because of its relation to the killing of Officer Bruno, of whose death she learned later.

The witness Carroll said that she, together with Mildred Barber and Christine Clark, was in the Police Station under a charge of accessory after the fact to the murder of Officer Bruno, and that they, together with Joel Olds and West, while waiting to appear in the Police Court, heard West say to Christine Clark: "You tell the boys that I was with you the day before, the night and the day after, and if you don't I will hang."

When West returned from Nashville, he refused to make a statement, but he did listen to statements taken on tape from the other parties, that is, Carroll, Clark, Barber and Olds, and immediately denied each of them and said that he was being framed.

Granville Allison, a reporter for the Commercial Appeal, said that he interviewed West upon his return to Memphis from Nashville, at which time West said: "I know nothing at all about the Bruno killing, I had nothing to do with it." He said Monts came into the Anderson home where he, West, was staying with Christine Clark, the daughter of the Andersons at about 9:00 A.M. (October 7, 1960), and when asked what brought him out so early, Monts said: "I have gotten into a fight with the police, and they kicked in a couple of my ribs." He then inquired if West had any medicine to take care of it. West is quoted by Allison as saying that he went and got some tape for Monts and that Monts then came back and lay down on the bed.

Mrs. Anderson testified for the defense and said that she was cooking breakfast when she heard over the radio about the death of Officer Bruno and that on the night he was killed that Monts and West spent the night there from about 10:00 P.M. and that, although one or more of them slept in the back bedroom, they could not have left the house by way of the back door because she had the door locked and kept the key under the rug. Just why she kept the key under a rug is not explained.

Mrs. Anderson denied that she told a newspaper reporter, Dennis Mallick, that the men could have left the house by way of the back door without her knowing it, and she further denied telling the reporter that Christine Clark had told her that the reason that she had not reported the Bruno killing was because she had been threatened.

Both of the plaintiffs in error denied any knowledge of the offense of burglarizing the liquor store, the grocery store, or the Ace Sundry Store, and denied they were involved in any way, directly or indirectly, with the killing of Officer Bruno. At first West said that he was confined in the Shelby County Penal Farm at the time in question, but the records at the Farm are to the contrary.

Both of these defendants have long criminal records. Monts was convicted of the larceny of an automobile in 1950, at the age of 21. In 1961 he was convicted of petit larceny and had been associated with West who had a criminal record dating back to 1945, when he was convicted for grand larceny. In 1949 he was convicted again for grand larceny, and in 1951 for burglarizing an automobile. In 1954 he was convicted for armed robbery. He was convicted in 1959 for carrying a pistol; and in 1961 he was convicted for robbery with a deadly weapon. The

reading of the testimony of these two plaintiffs in error is convincing proof that they are men of intelligence. Monts served two years in the Army and has a diploma showing that he has the equivalent of a high school education.

■ The first assignment of error relates to the sufficiency of the evidence to warrant the jury in finding the plaintiffs in error guilty as charged. We have set forth the evidence in detail, and, as we have said before, the burden here is upon the plaintiffs in error to show that the evidence does preponderate against the verdict of the jury and in favor of their innocence. We do not feel that they have carried this burden.

■ These are contradictions, discrepancies, and inconsistencies in the statements of some of the witnesses, but the duty of the jury, under the charge of the court, is to reconcile such discrepancies and differences and to arrive at the truth of the situation as best they can from the entire evidence and report a verdict consistent with justice. In *McBee v. State,* supra, and many other opinions rendered prior and subsequent thereto, we have set forth the duty of the jury as aforesaid, and have said that the jurors, together with the trial judge, who see and hear the witnesses, observe their demeanor and conduct while on the witness stand, and otherwise evaluate their testimony, are in a far better position to arrive at the truth in the case than we, who merely see the printed record. *Holt v. State,* 210 Tenn. 188, 357 S.W.2d 57 (1962); *Anderson v. State,* 207 Tenn. 486, 341 S.W.2d 385 (1960), and many other cases.

■ In regard to the contention that the Court erred in refusing to grant the defendants separate trials, we have

found from reading a great number of prior decisions that this is a matter that rests within the discretion of the trial court. When this case was here on appeal before, we, again, held that the granting of a severance was a matter of discretion of the trial judge and unless that discretion is abused, his action will not be disturbed on appeal. *Monts v. State,* supra, 214 Tenn. at 182, 379 S.W. 2d 34. To the same effect is *Anderson v. State,* supra, and *Woodruff v. State,* 164 Tenn. 530, 51 S.W.2d 843 (1932).

In *Turner v. State,* 187 Tenn. 309, 213 S.W.2d 281 (1948), the reason for refusal of the trial court to grant a severance is set forth in this language:

It may have been to the interest of each that he be tried alone, but the orders of the court are molded to protect rights, and not merely the interests, of persons accused of crime. The state, as well as the person accused, is entitled to have its rights protected, and, when several persons are charged jointly with a single crime, we think the state is entitled to have the fact of guilt determined and punishment assessed in a single trial, unless to do so would unfairly prejudice the rights of the defendants. 187 Tenn. at 316, 213 S.W.2d at 284.

We have reversed the action of the trial court in failing to grant a severance in several cases where we felt, from reading the record, that the trial judge abused his discretion in failing to grant the motion. We are not so convinced in this case.

The only valid reason, in our opinion, for contending that West was prejudiced by the failure of his motion for severance to prevail, is that the confession of Monts, admitted into evidence, implicated West. When this con-

fession was introduced the trial court, upon motion of counsel for West, made the statement to the jury that the evidence would not be considered against West and when asked if it understood the instructions, the record shows that the jurors replied: "Yes, sir."

In the general charge the court instructed the jury again to the same effect. At the conclusion of the charge, counsel for West submitted a special request, to-wit:

The Court instructs the jury that if there is any evidence tending to show accusations or statements made against a defendant out of his presence and unheard by him, you are instructed not to consider such statements or accusations for any purpose whatsoever in determining the guilt or innocence of a defendant.

This special request was granted.

In *Monts v. State,* supra, 214 Tenn. at 190, 379 S.W.2d at 42, it was said:

This Court has repeatedly held that when two or more defendants are tried jointly, a confession made by one of them, which confession incriminates one or more of the other defendants, is not rendered inadmissible because of the fact that it was made outside the presence of the other defendant or defendants incriminated therein. Such a confession is admissible under these circumstances; but it is incumbent upon the trial judge to instruct the jury that the confession is only competent evidence against the defendant making it and that it must not be considered by them against any defendant not present when it was made. *Thompson v. State,* 171 Tenn. 156, 101 S.W.2d 467 (1937); *Porter v. State,* 177 Tenn. 515, 151 S.W.2d 171 (1941); *Kennon v. State,*

181 Tenn. 415, 181 S.W.2d 364 (1944); *Kennedy v. State,* 186 Tenn. 310, 210 S.W.2d 132 (1947).

In the present case the judge instructed the jury on at least three occasions not to consider the confession of Monts against West, and, as indicated, the jury said that it understood the instructions. Therefore, assignment of error number two is overruled.

By assignment of error number three it is contended that it was error for the trial judge to permit the introduction of the alleged confession of Monts into evidence. It is contended that the confession was inadmissible because not voluntarily given and further that he was not advised of and did not waive his constitutional right to counsel before the statement was taken.

It will be remembered that Monts was questioned at length and made oral statements to Inspector Swann and other police officers, but before these statements were written down Monts was advised by Swann as hereinabove set out. Monts is a man of intelligence, having a high school education or its equivalent, and this was not his first encounter with the law. He had served two prior sentences. He seemed to be familiar with terms relating to the process of extradition and otherwise appeared to be unusually intelligent as evidenced by his testimony in this case and in the prior case, which we reversed for the reasons aforesaid.

The rule in this State is that the admissibility of a confession is a preliminary question to be determined by the trial judge. It is his duty to determine whether there is credible evidence that a confession has been made, and whether it was made freely and voluntarily. *Self v. State,* 65 Tenn. 244 (1877); *Wynn v. State,* 181

Tenn. 325, 181 S.W.2d 332 (1944), and the recent case decided by this Court in an opinion written by Mr. Justice Chattin, *Beaver v. State,* 217 Tenn. 447, 398 S.W.2d 261, released January 5, 1966.

█ As was said in the last case, the failure of officers to advise one arrested for a crime that he is entitled to counsel and to remain silent are circumstances to be considered by the trial judge in determining the voluntariness of a confession. *Hickson v. State,* 196 Tenn. 659, 270 S.W.2d 313 (1954); *Cordell v. State,* 207 Tenn. 231, 338 S.W.2d 615 (1960).

█ If one charged with a crime freely and voluntarily confesses to the charge without inducement, coercion or fear, he has not been fundamentally prejudiced, and by voluntarily making a statement he has waived his right to counsel and to remain silent, although he has not been advised of these rights by the officer. Of course, Monts was advised, according to the officer, of these rights prior to the writing down of the statement which was introduced as evidence in this case and the court so found.

In the case of *Haynes v. State of Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), the Supreme Court of the United States said:

* * * "the question in each case is whether the defendant's will was overborne at the time he confessed," *Lynumn v. State of Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922.

█ In short, the true test of admissibility is that the confession is made freely, voluntarily, and without compulsion or inducement of any sort; and, of course, whether the confession was obtained by coercion or im-

proper inducement can be determined only by an examination of all the attendant circumstances.

■ Unless the evidence heard by the trial judge at the preliminary hearing on the question of admissibility of a confession preponderates against his finding that the confession was freely and voluntarily given, this Court cannot say that he erred in admitting it into evidence. *Taylor v. State,* 191 Tenn. 670, 235 S.W.2d 818 (1950) ; and *Monts v. State,* supra.

The plaintiffs in error rely upon the case of *Escobedo v. State of Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1965), but we do not think the holding in that case has changed the foregoing rules of procedure. Neither do we think it is authority to support an argument that no statement can be admitted as evidence in a criminal proceeding made by defendant, after he has been arrested and charged with having committed a crime, tending to incriminate himself without being advised before making the statement he is entitled to counsel.

■ The decision in the *Escobedo* case was limited to the facts of the case as expressly stated therein. In that case Escobedo had requested counsel and had been denied an opportunity to consult with his lawyer who was then and there trying to talk with his client, Escobedo. We have no such factual situation appearing in this record, and, as a matter of fact, the trial judge found from all of the evidence that Monts made no request for counsel. In other words, he said that the confession was given freely and voluntarily and we cannot say that the preponderance of the evidence is against this holding.

■ We are not here dealing with an uneducated, illiterate defendant, but on the contrary, an intelligent

and knowledgeable person. Reading his testimony convinces us that he did make an intelligent waiver of any right to counsel and there is absolutely no evidence that his confession was obtained by hope or fear or by any other illegal means.

We say, again, as was said in the recent case of *Beaver v. State,* supra, that

We have been unable to find any authority holding the mere fact that the investigating officers failed to advise one charged with a crime he is entitled to Counsel before making an incriminating statement to them ipso. facto renders a confession involuntary and inadmissible in evidence.

Therefore, assignment of error number three is overruled.

██ In regard to assignment of error number four, the defendants introduced the testimony of Mrs. Elvie Anderson, in whose home the defendants spent the night of October 6, 1960, and some days subsequent thereto. She was asked by counsel on direct examination whether or not she had told a newspaper reporter by the name of Mallick about her daughter, Christine, being threatened and she was asked:

Q. Did Christine ever say anything to you about somebody threatening her, about not relating things?

A. No.

The State then, on rebuttal, introduced the witness Mallick, to refute this statement and it shows that Mrs. Anderson did make a statement that her daughter, Christine, had been threatened. It is submitted on behalf of plaintiffs in error that this rebuttal testimony was inad-

missible on the authority of *Hanvy v. State*, 215 Tenn. 322, 385 S.W.2d 752 (1964). We do not think that this case has any application to the facts developed herein. This question was first introduced on direct examination of Mrs. Anderson, who appeared as a witness for the defense and in order to rebut her denial that such a statement had been made to her by her daughter, Christine Clark, the witness Mallick was introduced to show that Mrs. Anderson had made such a statement to Mallick. We see nothing wrong with this method of impeaching the testimony of Mrs. Anderson. Assignments number four and five are overruled since they involve the same principle.

Assignment of error number six is apparently abandoned because there is no discussion of it in the arguments submitted on behalf of the plaintiffs in error.

The last assignment of error is to the effect the trial judge should have instructed the jury not to consider the confession of Monts unless it found beyond a reasonable doubt that it was freely and voluntarily given. The procedure followed by the trial judge conforms to the accepted practice in this State. It is the duty of the judge to determine the admissibility of a confession and it is for the jury to determine what weight should be given the confession. *Boyd v. State*, 21 Tenn. 39 (1840); *Wooten v. State*, 203 Tenn. 473, 314 S.W.2d 1 (1958); *Tines v. State*, 203 Tenn. 612, 315 S.W.2d 111 (1958); *Beaver v. State*, supra, and other cases. See also Appendix A to separate opinion of Mr. Justice Black in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

Based upon this entire record, we are satisfied that plaintiffs in error are guilty as charged and that they

have had a full, fair and impartial trial under the accepted standards of the law. The jury sentenced them to serve 150 years each, but by virtue of Chapter 273 of the Public Acts of 1965 (T.C.A. sec. 40-3613), they "may become eligible for parole * * *" after they have "served a term in the state penitentiary of not less than thirty (30) full calendar years," as may the original co-defendant, Joel Olds, who received a 99-year sentence when the three of them were tried jointly. Affirmed.

BURNETT, CHIEF JUSTICE, and DYER, CHATTIN and CRESON, JUSTICES, concur.