IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 8, 2015 Session

## STATE OF TENNESSEE v. TERRON KINNIE

**Appeal from the Circuit Court for Madison County**
No. 15004      Roy B. Morgan, Jr., Judge
_____

**No. W2015-00943-CCA-R9-CD  -  Filed August 5, 2016**
_____

Defendant, Terron Kinnie, was indicted by the Madison County Grand Jury for two counts of felony murder, two counts of aggravated robbery, and one count each of aggravated burglary and aggravated assault. Defendant filed a motion to suppress a statement he gave to the police, arguing that his statement was not voluntarily given. Following an evidentiary hearing, the trial court granted Defendant's motion to suppress, finding that Defendant's statement was coerced. The State filed a motion seeking permission to file an interlocutory appeal under Rule 9 of the Tennessee Rules of Appellate Procedure, and it was granted. Upon a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 9 Interlocutory Appeal; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General, James G. (Jerry) Woodall, District Attorney General; and Arron Chaplin, Assistant District Attorney General, for the appellant, State of Tennessee.

Joseph T. Howell, Jackson, Tennessee, for the appellee, Terron Kinnie.

### OPINION

*Factual and Procedural Background*

Defendant filed a motion to suppress a statement he gave to Investigator Daniel Long of the Jackson Police Department and Tennessee Bureau of Investigation (TBI)

Agent Valerie Trout on July 10, 2014. Following an evidentiary hearing, the trial court granted Defendant's motion, finding that Defendant's statement was not voluntary.

At the hearing on Defendant's motion to suppress, the parties stipulated that Defendant waived his *Miranda* rights. Defense counsel argued that Defendant's statement was not knowing and voluntary because he was under duress.

Daniel Long, an investigator with the major crimes unit of the Jackson Police Department, was assigned to investigate the beating death of the victim, Rico Swift. Investigator Long responded to the crime scene on June 8, 2014. Defendant was developed as a suspect in the case after another incident occurred on June 12, 2014, in which Defendant's home was the target of a drive-by shooting. Investigator Long first spoke to Defendant on July 9, 2014, when he took a statement from him. Defendant was incarcerated on an unrelated charge at the time of the interview. Defendant denied that he had any involvement in the victim's death. No video or audio recording of that interview was made.

Investigator Long testified that the interview lasted approximately two hours, and Investigator Richardson was also present. Investigator Long advised Defendant of his *Miranda* rights, and Defendant signed a waiver of rights form. Defendant told Investigator Long that he had spent ten years in prison, that he was a former gang member, and that he had reformed. During the interview, Investigator Long suggested that Defendant submit to a polygraph examination, and Defendant agreed to do so. The following day, Defendant was transported from the jail to the TBI offices in Jackson. Investigator Long was present with TBI Agent Valerie Trout. Investigator Long testified that Agent Trout explained the procedure for the polygraph examination to Defendant and read Defendant his *Miranda* rights. Defendant signed a form consenting to the polygraph test and a waiver of *Miranda* rights form.

Investigator Long testified that Defendant did not appear to be under the influence of drugs or alcohol. Defendant was offered a snack and water, which Defendant accepted. Investigator Long testified that Defendant did not request to speak with an attorney. Defendant was not handcuffed or shackled during the polygraph examination. Investigator Long testified that he did not promise Defendant anything, but he told Defendant "that his cooperation, truthfulness, being forthcoming would be conveyed to the [District Attorney]'s office for their consideration[.]" A video recording of the interview at the TBI offices on July 10, 2014, was admitted as evidence at the suppression hearing.

Defendant testified that he agreed to talk to Investigator Long on July 9, 2014, and he signed a waiver of his rights. Defendant testified that he agreed to take a polygraph

2

examination after he gave his statement. The following day, he was transported to the TBI office to take a polygraph exam. Defendant testified that he was told that he did not "pass the test[,]" and Agent Trout "started using unprofessional profanity towards [him]." Defendant testified that he gave the same statement he gave to Investigator Long the day before, and "they continued to threaten and pressure [him.]" Defendant testified that he felt pressured and harassed. Defendant testified that he "changed the story to what they wanted to hear."

Defendant acknowledged on cross-examination that he had a criminal history and that he had served ten years in incarceration. He testified that he was advised of his rights and that he signed a waiver and consented to submit to a polygraph examination. He acknowledged that he did not request an attorney.

The trial court viewed a video recording of the polygraph test and the subsequent interview that occurred on July 10, 2014. The trial court granted Defendant's motion to suppress his statement. The trial court found that the polygraph test and interview lasted for approximately four hours. The trial court noted that Defendant was 29 years old and that he completed eleventh grade. The trial court also noted that Defendant could read and write. The trial court found that Agent Trout read and explained the polygraph examination consent form and Defendant's *Miranda* rights. The trial court found that "[t]he original purpose, as no one is disputing today, for the Defendant being there, . . . on July 10th, was for the polygraph." The court noted that Defendant was transported "for [the] limited purpose [of] a polygraph" and that Agent Trout told Defendant that she was only going to ask him whether he was present during the beating death of the victim. The court noted that "it's just an hour or more of pleasantries and setting up for the polygraph." The trial court found that there was no threat of physical abuse and that Defendant was provided food and water. The trial court noted that Defendant had "prior experience with the system."

The trial court noted that Agent Trout did not advise Defendant of his *Miranda* rights a second time after the polygraph examination was completed and before he gave his incriminating statement. The trial court noted that Agent Trout told Defendant that she would testify as an expert witness against him that he was not telling the truth. The trial court stated, "[t]hat's a pretty stout hammer to hold over your head." The trial court noted that it was concerning to the court that Defendant was not told ahead of time that he would be interviewed after the conclusion of the polygraph examination. The court found that Defendant denied any involvement "a bunch of times." The trial court emphasized that Defendant was told he would only be asked whether he had any involvement and that he was not advised of his *Miranda* rights again before additional questioning.

3

The trial court noted that following the polygraph exam, Defendant was told "several times" that he could either be a defendant or a witness in this case. The court found that there was "no blatant misleading of any sort I don't think but there's innuendo[.]" In making its ruling, the court stated:

> It really doesn't let up for a long period of time. It's a matter of whether you're getting into a psychological game, and you can have the, the law is clear, psychological coercion. There's no doubt about it. You can have that [e]ffect on a person during an interrogation with two people coming at you at the same time with questions after you've been told you were there for a limited purpose and very specifically limited questions and no new *Miranda* warnings. These are all factors that concern me.

In granting the motion to suppress, the trial court made the following findings of fact:

> For all of those reasons stated, Counselors, I find that the Motion to Suppress should be granted given the totality of the circumstances, and I'm going to grant it. *Those are factors where I find that it could and would have been overbearing psychologically on this Defendant.*

(Emphasis added).

*Analysis*

In reviewing a motion to suppress, this court will uphold the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions concerning the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The party prevailing in the trial court is afforded "the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). However, when the findings of fact are based entirely on evidence that does not involve issues of witness credibility, "appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions[,] and the trial court's findings of fact are subject to de novo review." *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007) (citing *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)). Additionally, our review of the trial court's application of the law to the facts is de novo, with no presumption of correctness. *State v.*

4

*Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997)).

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." The test for voluntariness under the Tennessee Constitution is broader and more protective of individual rights than under the Fifth Amendment. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). In this case, Defendant does not dispute that he made a voluntary, knowing, and intelligent waiver of his rights to counsel and against self-incrimination during the interview with Investigator Long and Agent Trout. Instead, Defendant argues that the statements he made during his custodial interrogations were involuntary because they were the product of psychological coercion.

The voluntariness of a confession "remains distinct from *Miranda*." *State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *Dickerson*, 530 U.S. at 434-35). Because "coerced confessions are inherently unreliable," only voluntary confessions may be admitted as evidence. *Id*. (citing *Dickerson*, 530 U.S. at 433). It has long been held that for a statement to be voluntary, it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, *nor by the exertion of any improper influence*." *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)) (emphasis added). "A defendant's subjective perception *alone* is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Smith*, 933 S.W.2d at 455 (emphasis added). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id*. (quoting *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)); *see also State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008) ("for a confession to be involuntary, it must be the product of coercive state action"). However, as with any testimony, if the trial court explicitly or implicitly finds that a defendant's testimony is credible, the defendant's "perception" should be considered by the trial court in determining the involuntariness of a statement.

5

"[T]he particular circumstance of each case must be examined as a whole." *Smith*, 933 S.W.2d at 455 (citing *Monts v. State*, 400 S.W.2d 722, 733 (1966)). "The critical question is 'whether the behavior of the state's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Smith*, 933 S.W.2d at 455-56 (quoting *Kelly*, 603 S.W.2d 726, 729 (Tenn. 1980)). Factors relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Climer*, 400 S.W.3d at 568 (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)).

In the present case, Defendant was 29 years old at the time of the polygraph exam and subsequent interview. Defendant had a previous criminal history and was incarcerated on unrelated charges at the time of the interview. He told Agent Trout that he had already served a ten-year sentence in prison. The entire recording of the polygraph and interview was three hours and twenty-three minutes in length. Defendant was given the procedure for the polygraph, he indicated that he understood, and he signed a consent form. Agent Trout read Defendant his *Miranda* rights, Defendant indicated that he understood them, and he signed a waiver of rights form.

The first hour of the video depicts a casual and non-threatening conversation between Agent Trout and Defendant. Defendant was offered and accepted a snack and water. Defendant was not placed in any kind of restraints. Defendant told Agent Trout that he had completed eleventh grade, that he was in "perfect health," that he was not under the influence of any drugs or alcohol. Defendant was not taking any prescription medication, and he had no medical or psychological conditions. Defendant stated that he was not nervous about the exam. When Agent Trout expressed her disbelief that Defendant was not nervous, they both laughed, and Defendant admitted that he was a "little nervous."

6

Prior to beginning preparation for the polygraph examination, Agent Trout offered for Defendant to take a break and asked if he needed anything. The polygraph examination was completed at approximately one hour and thirty-six minutes into the video recording. Following the completion of the exam, Agent Trout offered Defendant the opportunity to take another break.

At approximately one hour and forty minutes into the recording, Agent Trout confronted Defendant with the results of the polygraph exam, and the tone of the interview became accusatory. She told Defendant that she would testify as an expert that he "absolutely did not tell the truth." Defendant repeatedly denied any involvement in the offenses. Agent Trout told Investigator Long that Defendant was the "mastermind" of the offenses and that the other suspects would testify that he was the "mastermind." She told Defendant that he was "going to be convicted." Twenty-four minutes after the tone of the interview changed, Defendant admitted to Investigator Long and Agent Trout that he was present at the offenses. After Defendant's admission, the interview continued for another hour in a calmer tone.

We agree with the trial court's determination that Agent Trout's statement to Defendant that she would testify as an expert against him was misleading. Also, our supreme court has stated that polygraph evidence is inadmissible. *State v. Sexton*, 368 S.W.3d 371, 409 (Tenn. 2012) (citing *State v. Damron*, 151 S.W.3d 510, 515-16 (Tenn. 2004)).

The trial court made factual findings that support its decision to grant the motion to suppress. The trial court made explicit and implicit factual determinations including findings of fact that support the conclusion that the conduct of the law enforcement officers was coercive in this case. Specifically, the trial court found that Defendant was informed that he was brought in solely for a brief polygraph examination; Agent Trout told Defendant that she would testify at trial as an expert witness that Defendant was not telling the truth, and that this representation was a "pretty stout hammer" held over Defendant's head; both law enforcement officers confronted Defendant at the same time with questions, even after repeated denials by Defendant; this conduct and other conduct by the law enforcement officers "could and would have been overbearing psychologically on this Defendant."

It is irrelevant that members of this court might have reached a different result if any of us had been the trial judge. As noted above, questions concerning the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Although some of the evidence consisted of a recording of the polygraph examination and interrogation, which arguably does not involve issues of

7

witness credibility, Investigator Long and Defendant both testified, and that evidence definitely involved witness credibility. The State, as appellant, is not entitled to have this court make its own credibility determinations to replace those implicitly found by the trial court.

The State is not entitled to relief in this appeal.

CONCLUSION

The judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE