IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 16, 2005

## STATE OF TENNESSEE v. AARON T. JAMES

**Appeal from the Criminal Court for Davidson County**
**No. 98-D-2345     J. Randall Wyatt, Jr., Judge**

_____

### No. M2004-00808-CCA-R3-CD

_____

The defendant, Aaron T. James, was convicted of especially aggravated kidnapping and the trial court imposed a sentence of sixty years. In this appeal, he asserts (1) that the evidence is insufficient; (2) that the trial court erred by limiting the questioning of a witness; (3) that the trial court erred by refusing to provide a jury instruction on the defense of necessity; (4) that the trial court committed plain error by permitting the state to make improper commentary on the law during closing argument; and (5) that the trial court erred by ordering that the defendant serve the sentence he received in this case consecutively to the sentence for a previous conviction. The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Gary Tamkin, Assistant District Public Defender, and Wendy S. Tucker, Nashville, Tennessee (at trial), and Jeffrey A. DeVasher, Assistant District Public Defender (on appeal), for the appellant, Aaron T. James.

Paul G. Summers, Attorney General & Reporter; Preston Shipp, Assistant Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In March of 1998, the defendant and a co-defendant, Tony Bobo, attempted to escape from Riverbend Maximum Security Prison. They first cut through the fence in the exercise yard before commandeering a delivery truck being driven by Department of Correction employee Anna Blithe. Bobo, who was armed with a prison-made knife, directed the victim into the cab of the truck and then drove into the perimeter fence. The pair was apprehended when guards overtook them before they were able to penetrate the outermost security fence.

At trial, Mark Hawood, who was working "mobile patrol" at Riverbend on the day of the attempted escape, described the facility as completely surrounded by two fences equipped with concertina and razor wires and sensors. He testified that the two fences are approximately twelve feet tall and thirty feet apart. Hawood recalled that he was in his patrol vehicle when he saw a delivery truck speeding toward the fence. According to Hawood, the truck knocked the interior perimeter fence "completely down." He stated that the driver then put the truck in reverse, drove around as if looking for a way to exit, and then returned and struck the fence in the same location. Hawood testified that he and another correctional officer opened fire on the vehicle and continued to fire until the vehicle came to a stop. The defendant was the first to exit the truck, followed by the victim, whom Hawood described as "hysterical," and finally Bobo.

Lieutenant Billy James McCleskey, who was employed by the Department of Correction as an institutional investigator and internal affairs liaison officer, testified that because both the defendant and Bobo were classified as maximum security inmates, they were allowed only one hour each day outside their cells. Lieutenant McCleskey stated that when maximum security inmates are released from their cells for recreation, they are placed inside individual recreation cages, which he described as two sets of four expanded steel cages with a walkway in the center. During his investigation, Lieutenant McCleskey discovered that the defendant had cut a hole in his exercise cage, entered into Bobo's cage and then cut a hole in Bobo's cage for entry into the exercise yard. The lieutenant testified that he found a "prison-made knife," or "shank," that was approximately six inches long and one inch wide in the driver's side floorboard of the delivery truck.

The victim, Anna Blithe, a storekeeper at Riverbend, testified that on the day of the offense she was delivering supplies to Unit 2, where the defendant and Bobo were incarcerated. She recalled that she turned off the ignition, put the keys in her pocket, and locked the doors before exiting the truck. As she walked toward the gate, she heard the fence rattle, saw the defendant and Bobo jump over the fence, and "froze" as Bobo "stuck a sharp object up to [her] neck." She testified that the defendant got into the truck first and she went in next so as to be seated between the defendant and Bobo, who was driving. When the victim asked the defendant why he was doing this, he responded, "[G]ot too much time, got too much time. We've got to get out of here." She stated that the defendant assured her that she would not be harmed.

The victim confirmed that Bobo drove the truck into the perimeter fence, knocking it down, and then backed up in order to gain more speed. She estimated that the truck was traveling approximately fifty miles per hour when it struck the fence a second time, clearing the first fence and partially tearing down the second. According to the victim, she then heard thumping sounds and the defendant instructed her to get down before convincing Bobo to surrender. The victim testified that the defendant opened the passenger side door and lay on the ground as she ran from the truck. She stated that the defendant never gave any indication that he was being held against his will.

During cross-examination, the victim conceded that Bobo had threatened her with the knife, had ordered her into the truck, and had driven the truck into the fence. She also acknowledged that the defendant repeatedly expressed a desire to surrender.

Bobo, as a witness for the defense, testified that prior to the attempted escape, he had been convicted of "several" murders, manslaughter, four counts of robbery, "and several other charges." He stated that two of his murder convictions were the result of killing other inmates, one of whom he bludgeoned with a dumb bell and one of whom he stabbed with a shank. He recalled that he met the defendant when the two were housed together in the maximum security unit at Riverbend. According to Bobo, he discussed the escape with the defendant on two occasions prior to the day of the offense. Bobo testified that "[t]he plan was to . . . open up the exercise cages, . . . go out through the hole . . . and to go over the fences, you know, and just go on from there." Bobo claimed that the pair planned to climb over the fences by going over the pole to avoid setting off the alarms. He contended that the defendant was unaware of his "backup plan," which was to "grab the truck and to go through the fences." Bobo also insisted that the defendant did not know that he was carrying the shank.

Bobo explained that he decided to carry out the alternate plan because "it took so long to get the hole in the cages." He stated that the defendant did not want to take the truck and "acted like he wanted to go back." Bobo claimed that he threatened the defendant with his weapon saying, "If your word ain't worth nothing, your life ain't worth nothing." Bobo testified that he directed the defendant to go under the fence between the exercise yard and the truck and then ordered both the victim and the defendant to get into the truck. According to Bobo, he started the truck and immediately began driving toward the fence. He testified that when he struck the second fence, the truck became stuck on the pole and the defendant told Bobo that "it was over." Bobo claimed that he refused to surrender and did not terminate the attempted escape until gunfire from correctional officers "busted the engine block." Bobo further contended that if the defendant had refused to accompany him in the truck, he would have "hurt him." Bobo admitted that he pled guilty to aggravated robbery, aggravated kidnapping, and attempted escape in connection with the incident.

During cross-examination, he acknowledged that he and the defendant had discussed escaping even before they were transferred to their cell block in Unit 2. Bobo claimed that they planned to scale the fences, which were topped with razor wire and equipped with alarms, with no extra padding under their clothing to protect them. He acknowledged that during the investigation prior to the trial, he did not inform investigators that he threatened the defendant.

I

The defendant first asserts that the evidence is insufficient to support the conviction because the proof established that he was acting under duress. In the alternative, the defendant contends that the evidence is sufficient only to support a conviction for the lesser included offense of facilitation of especially aggravated kidnapping and asks this court to modified his conviction. The state submits that the jury was free to reject the defense theory and to disregard the testimony of Bobo that he forced the defendant to participate in the kidnapping.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the

reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

To obtain a conviction for especially aggravated kidnapping, the state must prove that the defendant knowingly removed or confined the victim unlawfully so as to interfere substantially with her liberty and that the removal or confinement was accomplished by the use of a deadly weapon or that the victim suffered serious bodily injury. Tenn. Code Ann. §§ 39-13-302(a), -305(a).

The state's theory was that the defendant was criminally responsible for Bobo's conduct. Tennessee Code Annotated section 39-11-401 provides that "[a] person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Generally, a person is criminally responsible for the conduct of another if:

Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(2).

The defendant contends that he was merely present during the offense and that he was acting under duress because he had been threatened by Bobo. The evidence adduced at trial established that the defendant, in tandem with Bobo, cut a hole in his exercise cage and escaped into the prison yard. From there, he followed Bobo to the delivery truck. After Bobo grabbed the victim and held a shank to her throat, the defendant took the keys to the truck and unlocked the door. He was the first to enter the truck, sitting on the passenger side with the victim in the center and Bobo in the driver's seat. The victim testified that it was not until the prison guards began firing on the truck that the defendant suggested surrendering. The victim recalled that it was the defendant who explained that the two had kidnapped her and taken the truck because they had "too much time." While Bobo claimed that he forced the defendant to participate in the kidnapping by threatening to kill him, the jury was free to reject this testimony. See Tenn. Const. art. I, § 19; Byrge, 575 S.W.2d at 295. Because the trial court properly instructed the jury on the defense of duress, see Tenn. Code Ann. § 39-11-504, the defendant was not deprived of the benefit of his defense theory. Similarly, the defendant had the benefit of a jury instruction on the lesser included offense of facilitation of

especially aggravated robbery. The jury chose to accredit the testimony of the state's witnesses, as was its prerogative. See State v. Summerall, 926 S.W.2d 272, 275 (Tenn. Crim. App. 1995). Under these circumstances, it is our view that the evidence is sufficient to support the conviction.

II

The defendant next contends that the trial court erred by prohibiting the defendant from eliciting testimony that Bobo received a sentence of life without parole for his convictions relative to the attempted escape. The state submits that the length of Bobo's sentence was not relevant to any issue at trial and that permitting Bobo to testify regarding his sentence would inform the jury of the penalty the defendant faced.

"Relevant evidence" is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence." Tenn. R. Evid. 401. In State v. Forbes, this court discussed the standard of review of a trial court's determination of relevancy:

"Because an assessment of whether a piece of evidence is relevant requires an understanding of the case's theory and other evidence as well as a familiarity with the evidence in question, appellate courts give great deference to a trial judge's decision on relevance issues. Often it is stated that a trial court's decision on relevance will be reversed only for an abuse of discretion. . . ."

918 S.W.2d 431, 449 (Tenn. Crim. App. 1995) (quoting Neil P. Cohen et. al., Tennessee Law of Evidence § 401.5 (2d ed. 1990)).

Prior to the trial, the state filed a motion asking the trial court to prohibit any testimony regarding the sentence Bobo received in the case. The trial court granted the motion, ruling that Bobo's sentence was not relevant. During the cross-examination of Bobo, the prosecutor asked, "Now, even before this incident happened, your sentences were such that you would have never gotten out of prison, correct?" Bobo answered in the affirmative. At that point, defense counsel objected and argued that the state had opened the door to questioning about Bobo's life without parole sentence. The trial court disagreed, concluding, "I don't think that [a] question about something before this incident happened opens the door to what the penalty was in this case[.]" The trial court also observed that "the [j]ury is not allowed to know the [r]ange of [p]enalty when it's exactly identical in this case."

In this appeal, the defendant again asserts that the state "opened the door" to questioning about the sentence Bobo received for his role in the offenses by asking about the sentence he was facing at the time of the incident. The defendant argues that the question gave the mistaken impression that Bobo was not eligible for parole prior to his guilty pleas in this case.

In our view, any evidence regarding Bobo's sentence, either before or after the crime at issue, was irrelevant. That Bobo faced a lifetime in the penitentiary prior to the escape attempt had no

-5-

bearing on the issue of the defendant's guilt. Similarly, that Bobo received a sentence of life without the possibility of parole for his role in the attempted escape did not tend to make the existence of any fact more probable or less probable. See Tenn. R. Evid. 401. Further, it is our view that the state did not open the door to the admission of evidence of Bobo's life without parole sentence for the charges resulting from this case. The prosecutor did not imply that Bobo was ineligible for parole prior to the attempted escape and established only that Bobo was serving a life sentence for one of his murder convictions. The state's questioning did not mislead the jury and did not misrepresent the facts of the case. See generally State v. Bray, 669 S.W.2d 684, 687 (Tenn. Crim. App. 1983). In any event, however, the proof of the defendant's guilt was abundant. It is our view that any error caused by the trial court's ruling can be classified as harmless, having had no effect on the verdict. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

III

The defendant also contends that the trial court erred by failing to provide a jury instruction on the defense of necessity. The state submits that the trial court did not err because the defense of necessity was not raised by the proof.

Under the United States and Tennessee Constitutions, a defendant has a constitutional right to trial by jury, which dictates that all issues of fact be tried and determined by twelve jurors. U.S. Const. amend VI; Tenn. Const. art. 1, § 6; see State v. Bobo, 814 S.W.2d 353, 356 (Tenn. 1991); Willard v. State, 174 Tenn. 642, 130 S.W.2d 99 (1939). This right encompasses the defendant's right to a correct and complete charge of the law. State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). In consequence, the trial court has a duty "to give a complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see State v. Forbes, 793 S.W.2d 236, 249 (Tenn. 1990); see also Tenn. R. Crim. P. 30.

Our law requires that all of the elements of each offense be described and defined in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). When the evidence in the record fairly raises or supports the existence of a defense, the trial court is compelled to instruct the jury on the issue. Manning v. State, 500 S.W.2d 913, 915-16 (Tenn. 1973); see also Almonrode v. State, 567 S.W.2d 184, 187 (Tenn. 1978). As part of its instruction, the trial court must inform the jury that any reasonable doubt on the existence of the defense requires acquittal. Tenn. Code Ann. § 39-11-203(c); State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998); State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). This court has added that "due process requires that a criminal defendant be afforded a meaningful opportunity to present a complete defense, which includes the right to have the jury instructed regarding fundamental defenses raised by the evidence." State v. Nevens, No. M2000-00815-CCA-R3-CD (Tenn. Crim. App., at Nashville, Apr. 27, 2001); see also Tenn. Code Ann. § 39-11-203(c), (d).

Whether the evidence has raised a defense and, therefore, requires a jury instruction depends upon an examination of the evidence in a light most favorable to the defendant. Bult, 989 S.W.2d at 733. Tennessee Code Annotated section 39-11-609 provides that "conduct is justified if . . . [t]he person reasonably believes the conduct is immediately necessary to avoid imminent harm and . . .

[t]he desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct." As observed in the Sentencing Commission Comments:

> This section codifies the common law defense of necessity. It excuses criminal liability in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation. For example, the necessity defense would bar a trespass conviction for a hiker, stranded in a snowstorm, who spends the night in a vacant cabin rather than risking death sleeping in the open.

Tenn. Code Ann. § 39-11-609, Sentencing Commission Comments.

Necessity has traditionally been used appropriately when the extreme situation is brought on by something other than a human act. Neil P. Cohen et al., Prevalence and Use of Criminal Defenses: A Preliminary Study, 60 Tenn. L. Rev. 957, 966 (1993). Examples of necessity include a ship violating an embargo law to avoid a storm, a pharmacist providing medication without a prescription to alleviate someone's suffering during an emergency, or one of two shipwrecked sailors pushing the other off the float to save his own life. 11 David L. Raybin, Tennessee Practice § 28.118 (1985 & Supp. 1997). This court has held that in order for a defendant to be entitled to the defense of necessity, he "must show an immediately necessary action, justifiable because of an imminent threat, where the action is the only means to avoid the harm." State v. Watson, 1 S.W.3d 676 (Tenn. Crim. App. 1999) (citing State v. Green, 915 S.W.2d 827, 832 (Tenn. Crim. App. 1995)).

In this case, the trial court provided an instruction on the defense of duress:

> Included in the defendant's plea of not guilty is his plea that his acts constituting the offense charged were the result of duress.
> Duress is a defense to prosecution where:
> (1)     the defendant is threatened with harm which is present, imminent, impending, and of such a nature as to induce a well-grounded apprehension of death or serious bodily injury if the act is not done;
> (2)     the threatened harm is continuous throughout the time the act is being committed;
> (3)     the harm is one from which the defendant cannot withdraw in safety; and
> (4)     the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.
>                               *          *          *

> This defense is unavailable to a person who intentionally, knowingly, or recklessly becomes involved in a situation in which it was probable that the person would be subjected to compulsion.

The trial court refused, however, to provide an instruction on the defense of necessity, ruling that it had not been fairly raised by the proof.

In State v. Green, this court held that "the defenses of duress and necessity are similar both in form and in the policy supporting the availability of both defenses." 995 S.W.2d 591, 606 (Tenn. Crim. App. 1998). This court ruled that because the statutory provision is a codification of the common law, common law distinctions between the defenses of necessity and duress are instructive.

> "Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Thus, where A destroyed a dike because B threatened to kill him if he did not, A would argue that he acted under duress, whereas if A destroyed the dike in order to protect more valuable property from flooding, A could claim a defense of necessity."

Id. (quoting United States v. Bailey, 444 U.S. 394, 409-10 (1980)). The defense of necessity is generally only available when nonhuman acts prompt the illegal action. State v. Jason C. Polston, No. W2003-02556-CCA-R3-CD (Tenn. Crim. App., at Jackson, Aug. 19, 2004).

The proof adduced at trial, in the light most favorable to the defendant, established that after the defendant and Bobo freed themselves from the exercise cages, Bobo decided that they should take the delivery truck. Bobo testified that the defendant did not want to take the truck and expressed a desire to abandon the escape. Bobo claimed that at that point, he threatened the defendant with the shank, saying, "If your word ain't worth nothing, your life ain't worth nothing." It was Bobo's contention that he directed the defendant to unlock the delivery truck after they had taken the keys from the victim. Both Bobo and the victim testified that it was the defendant who suggested that they surrender when the guards began firing on the truck. Under these circumstances, an instruction on duress was warranted and was given by the trial court. The same cannot be said for the defense of necessity. There was no proof that the defendant was compelled to participate in the kidnapping by any nonhuman act. The only proof was that Bobo forced the defendant to participate in a secondary plan of escape. In our view, the trial court did not err by refusing to provide an instruction on the defense of necessity.

IV

The defendant next contends that the trial court erred by permitting the state to make improper commentary on the law during closing argument. Because he did not make a contemporaneous objection at trial and did not raise the issue in a motion for a new trial, the defendant asks this court to review the issue under the plain error doctrine.

Initially, as the defendant concedes, there was no objection during the prosecutor's closing argument and he did not raise the issue of improper argument in a motion for new trial. Appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); see State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988) (waiver applies when the defendant fails to make a contemporaneous objection); see also State v. Jenkins, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); State v. Rhoden, 739 S.W.2d 6, 11-12, 18 (Tenn. Crim. App. 1987). Whether properly assigned or not, however, this court may consider plain error upon the record under Rule 52(b) of the Tennessee Rules of Criminal Procedure. State v. Ogle, 666 S.W.2d 58 (Tenn. 1984).

Before an error may be so recognized, it must be "plain" and must affect a "substantial right" of the accused. The word "plain" is synonymous with "clear" or equivalently "obvious." United States v. Olano, 507 U.S. 725, 732 (1993). Plain error is not merely error that is conspicuous, but especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings. See State v. Wooden, 658 S.W.2d 553, 559 (Tenn. Crim. App. 1983). In State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994), this court defined "substantial right" as a right of "fundamental proportions in the indictment process, a right to the proof of every element of the offense and . . . constitutional in nature." In that case, this court established five factors to be applied in determining whether an error is plain:

(a) The record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused [must not have waived] the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

Id. at 641-42. Our supreme court characterized the Adkisson test as a "clear and meaningful standard" and emphasized that each of the five factors must be present before an error qualifies as plain error. State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000).

Trial courts have substantial discretionary authority in determining the propriety of final argument. Although counsel is generally given wide latitude, courts must restrict any improper argument. Sparks v. State, 563 S.W.2d 564 (Tenn. Crim. App. 1978). Generally speaking, closing argument "must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978). For example, our supreme court has ruled that argument that "that defense counsel was 'trying to throw sand in the eyes of the jury' and 'blowing smoke in the face of the jury'" is improper argument.

State v. West, 767 S.W.2d 387, 395 (Tenn. 1989). To merit a new trial, however, the argument must be so inflammatory or improper as to affect the verdict. Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758 (1965). In Judge v. State, this court articulated the factors to be considered in making that determination:

> (1) the conduct complained of viewed in the context and the light of the facts and circumstances of the case;
> (2) the curative measures undertaken by the court and the prosecution;
> (3) the intent of the prosecutor in making the improper statements;
> (4) the cumulative effect of the improper conduct and any other errors in the record; and
> (5) the relative strength or weakness of the case.

539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

In this case, the defendant complains that the prosecutor's comment on the consideration of the lesser included offenses was improper. He contends that the prosecutor's argument that the jury must unanimously agree that the defendant is not guilty of the greater offense before considering the lesser offenses is in direct conflict with our supreme court's decision in State v. Ely, 48 S.W.3d 710 (Tenn. 2001). The state submits that the comment was not improper because it was a correct summary of the jury instructions provided by the trial court and that the jury instructions were a correct statement of the law.

During closing argument, the prosecutor made the following statement regarding the jury's consideration of the lesser included offenses:

> Now, the Judge is . . . required by the law to give you what's called lesser included offenses. It starts of with [e]specially [a]ggravated [k]idnapping. And it goes down to [a]ggravated [k]idnapping and [k]idnapping. And there's a whole laundry list of things there.

> But here's what I'm going to tell you about that. And that is that the law requires you to consider the charged offense first, [e]specially [a]ggravated [k]idnapping. If you find him guilty beyond a reasonable doubt of that, unanimously, then your work is done, which is what the verdict should be. Your work is done. You enter that on the ballet form. And then you report out. If you unanimously conclude that he is not guilty of that offense, then you may proceed to the next lowest offense. If you do not unanimously conclude that he is not guilty of that offense, then you cannot move down to the next one.

It is well established that "the courts are the proper source from which [the jury is] to get the law." Dale v. State, 18 Tenn. 551, 555 (1837). The trial court has the duty to charge the law relative to the case. See Cordell v. State, 207 Tenn. 231, 338 S.W.2d 615, 618 (1960); see also Tenn. Const.

art. I, § 19. "It is the function of the trial court, and not that of counsel, to instruct or advise the jury as to matters of law." State v. David Ivy, No. W2003-00786-CCA-R3-DD (Tenn. Crim. App., at Jackson, Dec. 30, 2004).

Counsel should refrain from attempting to instruct the jury on the law. See Smith v. State, 626 S.W.2d 283, 285 (Tenn. Crim. App. 1981) ("It is the province of the trial judge to state to the jury the law of the case, and it is not always advisable to counsel to do so in final argument because of the possibility of error in their summation."). In this case, however, the prosecutor's commentary was not an incorrect statement of the law. See State v. Rutherford, 876 S.W.2d 118, 120 (Tenn. Crim. App. 1993) (holding that jury instruction requiring sequential consideration of the lesser included offenses was proper); see also State v. Letivias Prince, No. M1998-00005-CCA-R3-CD (Tenn Crim. App., at Nashville, Aug. 10, 2000). Further, the trial court provided the correct instruction regarding the consideration of the lesser included offenses. See State v. Smith, 893 S.W.2d 908, 914 (Tenn. 1994) (the jury is presumed to follow the instructions of the trial court). Under these circumstances, it is our view that the comment was not so inflammatory as to have affected the verdict. See Harrington, 385 S.W.2d at 759. In consequence, the error does not qualify as "plain."

V

As his final issue, the defendant asserts that the trial court erred by ordering that he serve his sentence consecutively to the fifty-year sentence that he was serving at the time of the offense. The state submits that consecutive sentencing was proper because of the defendant's extensive criminal record and because the defendant qualifies as a dangerous offender.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

Prior to the enactment of the Criminal Sentencing Reform Act of 1989, the limited classifications for the imposition of consecutive sentences were set out in Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976). In that case, our supreme court ruled that aggravating circumstances must be present before placement in any one of the classifications. Later, in State v. Taylor, 739 S.W.2d 227 (Tenn. 1987), our high court established an additional category for those defendants convicted of two or more statutory offenses involving sexual abuse of minors. There were, however, additional words of caution:

> [C]onsecutive sentences should not routinely be imposed . . . and . . . the aggregate maximum of consecutive terms must be reasonably related to the severity of the offenses involved.

Taylor, 739 S.W.2d at 230. The Sentencing Commission Comments adopted the cautionary language. Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments. The 1989 Act is, in essence, the codification of the holdings in Gray and Taylor; consecutive sentences may be imposed in the discretion of the trial court only upon a determination that one or more of the following criteria[1] exist:

(1) The defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of livelihood;
(2) The defendant is an offender whose record of criminal activity is extensive;
(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
(6) The defendant is sentenced for an offense committed while on probation; or
(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b).

---

[1] The first four criteria are found in Gray. A fifth category in Gray, based on a specific number of prior felony convictions, may enhance the sentence range but is no longer a listed criterion. See Tenn. Code Ann. § 40-35-115, Sentencing Commission Comments.

The length of the sentence, when consecutive in nature, must be "justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1), and "no greater than that deserved" under the circumstances, Tenn. Code Ann. § 40-35-103(2); State v. Lane, 3 S.W.3d 456 (Tenn. 1999).

The trial court ordered consecutive sentences on the following grounds:

> The [c]ourt is of the opinion that you do have to look at the entire matter to determine whether this man will be considered a dangerous offender or not. The offense that he's here about, even though I think you could acknowledge that Tony Bobo was probably, maybe, more of the dominant person between these two, and if there were a leader between the two, you would probably think that Tony Bobo was that person.
>
> Even though that is the case, I think there's plenty of evidence in this case that . . . [the defendant] went along willingly with the same purpose as Mr. Bobo, knowing that this was a dangerous situation, kidnapping [the victim], and that even though he may have . . . attempted to shield the [victim] when . . . the thing was . . . gone wrong, and they were not going to be able to get through these two fences they were trying to get through . . . then he may have had more of a conciliatory approach . . . . There's no question but that this scheme or this effort to escape from the penitentiary with Mr. Bobo was something that was very, very dangerous, and that that . . . applies in this case.
> Not only that, but . . . [the defendant] . . . a few months after this offense, apparently, on December the 27th of . . . 1998, along with five other inmates, overpowered officers at the maximum security, Unit 1, and exited this unit. Using a ladder, they scaled the perimeter defenses on the east side of the compound. And so it's obvious that [the defendant] not only on this occasion, where this truck was running around there, kept running into the fence and going into the perimeter, or wherever he was going, there was another thing in the same year . . . . And obviously, with the conviction[s] that he has for [s]econd [d]egree [m]urder, [e]specially [a]ggravated [k]idnapping, and [a]ggravated [r]obbery and other offenses that he was on, it's obvious, he's in a category of a person that you would have to consider to be a dangerous offender.
> In addition to that, . . . in the Code, . . . 40-35-115(2), I think, obviously, this defendant is an offender whose record of criminal activity is extensive. . . .

The trial court also agreed with the prosecutor's statement that "he would pose a threat to the safety of the public and that the length of the sentence is commensurate with . . . that in mind."

As a career offender convicted of a Class A felony, the defendant was sentenced to sixty years, the only sentence provided for by statute. See Tenn. Code Ann. §§ 40-35-108 ("A defendant who is found by the court beyond a reasonable doubt to be a career offender shall receive the

maximum sentence within the applicable Range III."); -112 ("A 'Range III' sentence is . . . [f]or a Class A felony, not less than forty (40) nor more than sixty (60) years[.]").  The trial court ordered that the defendant serve his sentence consecutive to the fifty-year sentence he was serving at the time of the offense, concluding that the defendant was a dangerous offender and that his record of criminal activity was extensive.

In Gray, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses.  In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our high court reaffirmed those principles, holding that consecutive sentences cannot be required of the dangerous offender "unless the terms reasonably relate[] to the severity of the offenses committed and are necessary in order to protect the public (society) from further criminal acts by those persons who resort to aggravated criminal conduct."  The Wilkerson decision, which modified somewhat the strict factual guidelines for consecutive sentencing adopted in State v. Woods, 814 S.W.2d 378, 380 (Tenn. Crim. App. 1991), described sentencing as a "human process that neither can nor should be reduced to a set of fixed and mechanical rules."  905 S.W.2d at 938.

Although the ruling with regard to the Wilkerson factors could have been more specific, the trial court made the appropriate findings.  Further, the record supports the finding that the defendant is a dangerous offender.  Already convicted of second degree murder, especially aggravated kidnapping, and aggravated robbery, the defendant planned a prison escape with Bobo, who had already been convicted of four counts of murder, voluntary manslaughter, especially aggravated kidnapping, and aggravated robbery, among other offenses.  As was made clear by both the defense and the prosecution at trial, Bobo had a reputation as a dangerous man, one justly deserved.  The two then kidnapped the victim at knife point, commandeered the delivery truck, and crashed it into the perimeter fence.  They stopped only when they were greeted by a hail of gunfire.  The risk to the life of the victim and the other correctional officers was considerable.  Additionally, the defendant has a history of violent offenses.[2]  In our view, the defendant's behavior demonstrated he had little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high.  The effective sentence reasonably relates to the seriousness of the offense.  Finally, it is our view that the aggregate term, 110 years, is necessary to protect the public from this defendant.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE

---

[2] The record established that the defendant was involved in a second daring escape attempt only months after the offense in this case.