# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs December 15, 2010

## STATE OF TENNESSEE v. ELGENE PORTER aka "TWIN"

### Appeal from the Circuit Court for Rutherford County
### No. F-61561     Don Ash, Judge

---

### No. M2009-02443-CCA-R3-CD - Filed March 14, 2011

---

Following a jury trial, the Defendant, Elgene Porter aka "Twin," was convicted of conspiracy to commit aggravated burglary, aggravated burglary, attempted aggravated robbery, aggravated rape, and two counts of aggravated kidnapping. For these convictions, he received an effective sentence of forty-two years at 100% in the Department of Correction. In this direct appeal, the Defendant contends that: (1) the trial court erred in denying his motion to suppress statements he made to police; (2) the trial court erred in failing to immediately remove a juror once a potential conflict was identified; (3) the trial court erred in setting the length of his sentences; and (4) the trial court erred in ordering partial consecutive sentences. After our review of the record and the applicable authorities, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

DAVID H. WELLES, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and J.C. MCLIN, JJ., joined.

Mitchell Shannon, Murfreesboro, Tennessee, for the appellant, Elgene Porter aka "Twin."

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William Whitesell, District Attorney General; and J. Paul Newman, Assistant District Attorney General; for the appellee, State of Tennessee.

## OPINION

### Factual Background

This case arises from a home invasion by three perpetrators on November 22, 2006. While robbery to recover a gambling debt was the apparent motive, one of the perpetrators sexually assaulted the female, adult victim ("the victim") during the home invasion. After the Defendant and his twin brother, Eugene Porter, were developed as suspects in these crimes, a Rutherford County grand jury returned a seven-count indictment against them, charging them with conspiracy to commit aggravated burglary, a Class D felony, aggravated burglary, a Class C felony, aggravated robbery, a Class B felony, aggravated rape, a Class A felony, cruelty to animals, a Class A misdemeanor, and two counts of aggravated kidnapping, a Class B felony. See Tenn. Code Ann. §§ 39-12-103, -12-107, -13-304, -13-402, -13-502, -14-402 & -14-403. Testimony in this case was heard at a suppression hearing held on December 8, 2008, and at a jury trial held from May 12 through 14, 2009.

### Motion to Suppress Hearing[1]

Detective Jeff Peach of the Smyrna Police Department testified that, on April 16, 2007, he interviewed the Defendant. The Defendant was in custody at the Rutherford County Sheriff's Office for alleged offenses he committed in Murfreesboro. Detective Peach was joined by Detective John Liehr, also with the Smyrna Police Department, and the interview was videotaped. At the outset of the interview, Det. Peach read the Miranda warnings form to the Defendant, and the Defendant was allowed to read the form himself. The Defendant, afer being asked if he understood the warnings, signed the form and agreed to speak with the officers. Detective Peach stated that he followed standard procedure in interviewing the Defendant, that he had no reason to believe that the Defendant did not understand his rights, and that he thought that the Defendant was familiar with the court system because he had a criminal record.

Detective Peach confirmed that he made reference to the Murfreesboro case during the videotaped interview, stating that he only did so in order to reassure the Defendant that they were not there to interview him on those crimes. Detective Peach testified that he never made any promises to the Defendant about the Murfreesboro case in exchange for his cooperation. He admitted that he did mention the district attorney to the Defendant: "Basically just that no promises about them. Just saying that at some point this would go to the district attorney. That he wanted to have his story out to us." Detective Peach also informed the Defendant that whatever information he gave would be turned over to the district attorney for review. Detective Peach said he never attempted to make a "deal" with

---

[1] This was a joint motion to suppress hearing involving both brothers; their cases had not yet been severed.

the Defendant, and the Defendant did not seem confused about his authority, or lack thereof, to make a deal.

Detective Peach acknowledged that he spoke with the Defendant on a subsequent occasion in order to clarify conflicting information from the brothers about the existence of an additional participant in the home invasion. According to Det. Peach, this second meeting was very brief.

Detective Liehr confirmed that he participated in interviewing the Defendant and validated Det. Peach's testimony about the Miranda rights waiver form. Detective Liehr testified that he did not make any promises to the Defendant or encourage him to talk in exchange for help with the district attorney on the Murfreesboro charges. Detective Liehr also said that the Defendant never appeared to be confused, upset, or emotional during the interview. Detective Liehr substantiated that, shortly after interviewing the Defendant, they interviewed the Defendant's twin brother, Eugene. Despite the conflicting information about a possible fourth person, Det. Liehr opined that the two statements "basically mesh[ed] together" and were substantially true.

The videotaped statement was admitted as an exhibit to the hearing. During the interview, the Defendant also gave a handwritten statement that was recorded.

The Defendant testified that, prior to the videotaped statement, Det. Peach came to speak with him three or four times and did not give him any Miranda warnings. According to the Defendant, Det. Liehr would always bring up the Murfreesboro charges in these conversations, and he was confused because he did not "understand which one they was really trying to get at me with." The Defendant testified that he wrote the handwritten statement prior to the videotaped interview, that he did not understand what he was doing when he signed the waiver of rights form, and that he did not feel that he gave the statement freely and voluntarily. When asked why he did not feel his statement was voluntarily given, the Defendant replied, "Because for one they both was coming to me at a point where I'm in fear of another case." The Defendant testified that the detectives promised to "work with the DA" if he gave them information about the home invasion: "That he won't be looking at me no more and that he got who he wanted to get which was Von."

On cross-examination, the Defendant admitted that he had been arrested approximately twelve times, but believed he had been convicted only once for burglary of an automobile. He pleaded guilty to the auto burglary charge because he did not "understand what [he] was doing." The Defendant also testified that, even though he had been arrested twelve times, he had never been given Miranda warnings prior to this videotaped statement. Moreover, he did not remember the detectives reading his Miranda warnings to him at the

beginning of his statement but acknowledged his signature on the rights waiver form. He did dispute the date on the rights waiver form, believing that he was interviewed on a different day. When asked about his education, the Defendant responded that he graduated from Riverdale High School "Special Ed."

The Defendant stated that, although he did not request a lawyer on the videotape, he had previously asked for one. The Defendant also testified that the handwritten statement he gave was false, that he had only known of the plan to recover a gambling debt from the victim's husband after hearing it from "Von." As the district attorney attempted to review more details of the statement with the Defendant, the Defendant asserted his Fifth Amendment right and refused to answer any more questions.[2] The trial court denied the Defendant's motion to suppress.

**Trial**

At trial, the State presented the victim as its first witness. On the evening of November 21, 2006, the victim and her two-year-old daughter (the "child victim") were at their home in Smyrna. Neither the victim's two stepsons nor her husband, a professional gambler, were at home that evening. Her husband had gone to play poker. After a routine evening, she and the child victim went to sleep in the victim's bed; between 1:30 and 2:00 a.m., she heard her small terrier barking. Believing it was her husband returning home, she got up out of bed, turned on the television so the barking would not wake the child victim, and then went to the bedroom door to let the dog out.

When she opened the door, she saw three men standing at the door pointing guns at her. According to the victim, two of three men were approximately the same height, and they were all wearing dark colored clothes, dark "hoodies," long-sleeved dark shirts, dark (black or navy) ski-masks, and basic wool, work gloves. The men pushed her to the floor in the doorway of her bedroom, and one man bound her feet, wrists, and mouth with duct-tape. The dog kept barking loudly, and another man began to beat the dog. Almost immediately, the men began demanding money. Although the men were mostly covered by their clothing, the victim was able to see that two of the assailants were dark-skinned and that the other assailant was lighter-skinned.

After beating the dog until he went "limp," one of the men carried the dog out of the room by the "nape of his neck[.]" One of the men placed pillows around the child victim on the bed in order to create "an enclosure" for her. The men continued to demand money, and two of the men began ransacking the house looking for money, while the other (a dark-

_____

[2] Being unable to further cross-examine the Defendant, the State then moved to strike the Defendant's entire testimony, and defense counsel stated he could not oppose the State's motion.

skinned man) stayed and guarded the victim at gunpoint. While guarding the victim, the man fondled her, inserted his gloved finger into her vagina, ordered her to perform oral sex, and put his penis inside her vagina. He then placed the victim up on the bed with her daughter, who had begun to cry, and ordered her to use a vibrator on herself. As the men were leaving, they took a jar of money (containing approximately $50) and the victim's cell phone.[3] They told the victim, "We're going another route. We're going to find your husband." The victim estimated that the ordeal lasted from one and one-half to two hours.

After the men left and some time had passed, the victim freed herself from the duct-tape, fled the residence with her daughter and dog, and went directly to the police station. At the police station, the victim detailed the incident to Officer James Ridley of the Smyrna Police Department, who prepared a report. The victim was transferred to Stonecrest Medical Center where a rape kit examination was performed. Other than the color of their skin and the clothing they were wearing, the victim could not identify her assailants.

Detective Dustin Fait, also with the Smyrna Police Department, was called in as the crime scene investigator. He first went to the hospital, where he spoke with the victim, took some photographs of her, and collected the remaining duct-tape off her person. Detective Fait left the hospital and went to the victim's residence to collect additional evidence. Once there, he located some clothing (two ski-masks and one jacket) on a nearby street. The initial jacket and ski-mask were found very close to one another; the additional ski-mask was found a little further down the road. Inside the house, Det. Fait also found additional pieces of duct-tape, a vibrator, and pillows arranged on the bed in a "border of some sort." Detective Fait found a safe that had been opened and two jewelry boxes that had been pillaged. Detective Fait lifted some latent fingerprints from several locations in the house; however, to Det. Fait's knowledge, no fingerprints were identifiable.

After the Defendant was developed as a suspect in the home invasion, he was interviewed by Det. Peach and Det. Liehr. An edited version of the videotape was played for the jury. After initially denying any involvement in the crime, the Defendant stated that he was recruited to commit the robbery by a Laotian man named "Salon Von." During the interview, the Defendant admitted that he went inside the victim's house and that he fondled the victim's breasts and inserted his finger into her vagina. The Defendant also made a written statement detailing his participation in the home invasion. Both the videotaped and written statements were entered into evidence.

---

[3] She found her cell phone under the couch about three months later, but the jar of money was never recovered.

The rape exam did not reveal the presence of any sperm or semen. However, the Tennessee Bureau of Investigation's crime laboratory did match the DNA profile collected from a ski-mask at the crime scene to swabs collected from the Defendant and his twin brother (who, because they are twins, have identical DNA).

Following the conclusion of the proof, the jury found the Defendant guilty of conspiracy to commit aggravated burglary, aggravated burglary, attempted aggravated robbery, aggravated rape, and two counts of aggravated kidnapping. The Defendant was acquitted of the cruelty to animals charge.

## Sentencing

Thereafter, a sentencing hearing was conducted. The trial court sentenced the Defendant, a Range I, standard offender, to three years for the conspiracy to commit aggravated burglary conviction, five years for the aggravated burglary conviction, five years for the attempted aggravated robbery conviction, twenty-two years as a violent offender for the aggravated rape conviction, and ten years as a violent offender for each aggravated kidnapping conviction. The trial court further ordered the aggravated rape sentence and the two aggravated kidnapping sentences to be served consecutively to one another, resulting in a total effective sentence of forty-two years as a violent offender. This appeal followed.

## ANALYSIS

### I. Motion to Suppress Statement

The Defendant asserts that his inculpatory statement was the product of coercion because his Miranda rights were not relinquished voluntarily and the statement was induced by promises of leniency from Det. Peach and Det. Liehr. Thus, the Defendant contends the overall "coercive nature of the process which . . . exacted [sic] the confession" rendered his statement involuntary and the statement should have been suppressed. We disagree.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. While our supreme court has "traditionally interpreted article I, § 9 to be no broader than the Fifth Amendment," State v. Martin, 950 S.W.2d 20, 23 (Tenn. 1997), it has also held that one "significant difference between these two provisions is that the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

## A. **Miranda Warnings**

To help insure the protections of the Fifth Amendment in the criminal process, the United States Supreme Court held in Miranda v. Arizona that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. Accordingly, statements made by a defendant during custodial interrogation are not admissible at trial unless the defendant was first "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. After being notified of these rights, a defendant may waive them, "provided the waiver is made voluntarily, knowingly, and intelligently." Id. The test of voluntariness under the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the United States Constitution. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994).

When determining whether an accused has voluntarily, knowingly, and intelligently waived his Miranda rights, this Court must consider the totality of the circumstances which existed when the accused waived these rights. State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992), overruled on other grounds by State v. Stout, 46 S.W.3d 689 (Tenn. 2001); State v. Benton, 759 S.W.2d 427, 431 (Tenn. Crim. App. 1988). The totality of the circumstances must reveal an uncoerced choice and the required level of comprehension. State v. Blackstock, 19 S.W.3d 200, 208 (Tenn. 2000) (quoting Stephenson, 878 S.W.2d at 545). When a defendant contends that his waiver of Miranda rights was not voluntarily or understandingly made, the courts have considered such factors as the defendant's age, background, level of functioning, reading and writing skills, prior experience with the criminal justice system, demeanor, responsiveness to questioning, possible malingering, and the manner, detail, and language in which the Miranda rights were explained. Id. However, no single factor is necessarily determinative. Id.

## B. **Coercive Police Activity**

As acknowledged by the United States Supreme Court in Dickerson v. United States, the courts have long recognized that "coerced confessions are inherently untrustworthy." 530 U.S. 428, 433 (2000). In order to be considered voluntary, the statement must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Bram v. United States, 168 U.S. 532, 542-43 (1897). However, the Tennessee Supreme Court emphasized: "[b]ut, not all promises by state officers of leniency render involuntary confessions thereby induced." State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980).

In Tennessee, "[p]romises of leniency by state officers do not render subsequent confessions involuntary per se: 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are compelled by promises of leniency.'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (citing Kelly, 603 S.W.2d at 729). In determining whether or not a promise of leniency has "compelled" a statement, Tennessee courts must examine "whether the behavior of the state's law enforcement officials was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." Kelly, 603 S.W.2d at 728 (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). Additionally, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." Smith, 933 S.W.2d at 455. Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." Id.

When a defendant claims that a statement was compelled by the coercive police tactic of promises of leniency, the pertinent inquiry is not merely whether the statement was made only as a result of such promises. See Kelly, 603 S.W.2d at 729. Rather the standard is "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." Id. (quotation omitted); see also Smith, 933 S.W.2d at 455. In determining issues of voluntariness, the particular circumstances surrounding each confession or statement must be examined. Monts v. State, 400 S.W.2d 722, 733 (Tenn. 1966). Whether a statement was voluntarily given is determined by examining the totality of the circumstances. Kelly, 603 S.W.2d at 728-29.

## C. Trial Court's Ruling

After considering the evidence presented at the hearing on the motion to suppress, the trial court made several written findings of fact. In denying the motion to suppress, the trial court ruled as follows:

*Waiver [of Miranda Warnings]*

. . . [T]he detectives took care to inform [the D]efendant of his rights and to insure he understood them. Immediately thereafter, they began the interrogation. The detectives did not intimidate or threaten [the D]efendant in any way. Their questioning was restrained and free from the abuses. There is no indication in the video recording or the transcript of the video recording that [the D]efendant was under duress of any nature whatsoever. Given the execution of a written waiver and the totality of all other surrounding circumstances, the evidence preponderates toward a finding that [the D]efendant knowingly, intelligently, and voluntarily waived his rights by willingly speaking with the detectives after proper admonition.

*Voluntariness and Improper Inducement*

    . . . This [c]ourt does not find any improper offers which would render [the D]efendant's statement involuntary. The following dialogue from the interview transcript resolved any question or ambiguity regarding the power to charge or prosecute:

        By Defendant:  A. What am I gonna be charged with in this?

        By Detective Peach: Q.  I don't know of anything yet. I've got to go to the DA's office. Like I told you that's the whole deal. I can come here and lie to you and say I can give you this deal, I can give you this deal. That's a lie. I can't do that. Only the District Attorney's Office can do that. But I'm telling you you've got me on your side here.

    This unequivocal explanation by Detective Peach, along with [the D]efendant's age, education, and apparent mental condition, leads the [c]ourt to find, by a preponderance of the evidence, his statement was voluntarily given.

## D. Appellate Review

    "[A] trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We review a trial court's application of law to fact de novo, however. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). The party prevailing at the suppression hearing is further "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from such evidence." Odom, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

    On appeal, the Defendant does not deny that Det. Peach read him his Miranda warnings and that he agreed to waive those rights, even signing a rights waiver form. He argues solely that this waiver was the result of coercion, pointing to a statement made by Det. Peach that he was only reading the Defendant his Miranda warnings because the Defendant was in custody on an unrelated charge, thereby implying that, if the Defendant was not in custody, Miranda warnings would not have been necessary. While possibly inappropriate,

this statement is only one factor in determining the voluntary nature of the Defendant's waiver.

At the time of the interview in April 2007, the Defendant was incarcerated at the Rutherford County Sheriff's Office and was almost thirty years old. He had graduated from Riverdale High School, although he qualified that this was a "Special Ed" diploma. The Defendant was familiar with the criminal justice system, having been arrested at least twelve times, and Det. Peach knew of the Defendant's prior criminal record. Detective Peach stated that he read the Defendant his Miranda warnings, allowed the Defendant to read the warnings himself, confirmed that the Defendant understood his rights, and thereafter, the Defendant agreed to speak with the detectives. Detective Peach testified that he had no reason to believe that the Defendant did not understand his rights. As noted by the trial court, questioning began immediately after the Defendant was given his Miranda warnings. Moreover, the Defendant also gave a written statement during the interview, written in his own handwriting and when the detectives were out of the room.

The trial court found that the Defendant was not under any duress at the time he made the statement, and the videotape recording confirms that the detectives did not threaten or intimidate the Defendant in any way. We agree that the Defendant voluntarily waived his Miranda rights; he made an "uncoerced choice" to speak with the detectives, and the Defendant possessed the "required level of comprehension" of his rights.

As for any promises of leniency, Det. Peach confirmed that he made reference to the Murfreesboro case during the interview, stating that he only did so in order to reassure the Defendant that they were not there to interview him on those charges. Detective Peach testified that he never made any promises to the Defendant about the Murfreesboro case in exchange for his cooperation, telling the Defendant that whatever information he gave would be turned over the district attorney, and that he did not try to make any "deals" with the Defendant.

Detective Liehr also said that he did not make any promises to the Defendant about his Murfreesboro charges to encourage the Defendant to talk. Detective Liehr testified that the Defendant never appeared confused, upset, or emotional during the interview.

The trial court found that there were not "any improper offers which would render [the D]efendant's statement involuntary." After reviewing the videotape recording, we conclude there was no coercive police activity and no law enforcement behavior such as would overbear the Defendant's will to resist giving a statement. We also cannot conclude that the Defendant was so "gripped by the hope of leniency" that he could not freely and rationally choose not to give the statement he did. To the contrary, Det. Peach informed the Defendant

that only the district attorney could determine what charges to bring. The detectives made no definite statements about whether the Defendant would or would not be prosecuted, claiming only that, if the Defendant told the truth, they would let the district attorney know of his cooperation, i.e., they would be on "his side." The detectives never raised their voices or threatened the Defendant; they simply appealed to the Defendant to tell them the truth about how the crimes where committed and his involvement therein. The Defendant has failed to establish that the evidence preponderates against the trial court's determination that the statement was freely and voluntarily given.

## II. Juror

Next, the Defendant argues that the trial court erred when it allowed a juror to remain on the jury despite the juror's announced conflict, preventing a fair and impartial trial. After the fourteen-member jury (including two alternates yet to be determined) had been sworn and impaneled and just as the victim began testifying, a juror announced that she had a conflict. The following colloquy thereafter took place in open court:

> THE COURT: You don't have one.
>
> A JUROR: Actually when I saw her from across the room I didn't realize it was her.
>
> THE COURT: It doesn't make any difference.
>
> A JUROR: It doesn't matter that I know her?
>
> THE COURT: Not now. So how do you know her?
>
> A JUROR: Well, we went to school—all the way through school. And we were related by marriage for a while. I didn't realize it was her until she walked in front of me.
>
> THE COURT: That's fine. Okay. Keep going.

At the conclusion of the victim's testimony, the other jurors were excused from the room, and this juror was again questioned by the court. The juror once more relayed that she recognized the victim from school, because they attended school together from fifth grade through twelfth grade and graduated in 2001. When asked the last time she saw the victim, the juror stated that she had seen her once since graduation, probably in 2002 or 2003, at a friend's house. The trial court then asked the juror if she felt that she could still be fair and impartial, and the juror answered, "I don't think it's going to cause me any issues. I just

-11-

wanted you to be aware of it." The juror also confirmed that she would not give the victim's testimony any more credibility just because she knew her.

Defense counsel then requested that the juror be removed. The State acquiesced to defense counsel's request, offering as a remedy, "In the event that we get to the end of the trial and we have either one or two alternates, pull her as the alternate." The trial court then asked defense counsel whether he wanted the juror removed immediately or at the end of trial, to which defense counsel responded, "Your Honor, I guess my only concern would be if they follow their oath and don't discuss the case I don't have a problem with her at this point." The district attorney then stated, "Let her go if you want to." The trial court then declared, "All right. I'll take care of that."

Later during trial and after two more witnesses had testified, the trial court again addressed the juror outside of the presence of the other jury members:

> THE COURT: Yes, ma'am. And when I say this there's not a doubt in my mind that you cannot be impartial. I know you can. But I have to be kind of super cautious on these cases. . . . And so based upon what you told me I think it would be best if you did not serve as a juror on this case. So that's the reason I've got two alternates.

Trial then continued with thirteen potential jury members, and a remaining alternate was chosen at the end of trial and excused from deliberations.

On appeal, the Defendant states that, "[a]llowing the juror to remain for the first day of trial unduly prejudiced [the Defendant] as noted by his objection." The State argues that the Defendant has waived this issue by failing to raise it in his motion for new trial. We agree with the State that this issue has been waived. The only jury issue raised in the motion for new trial addressed the racial composition of the jury. Rule 3(e) of the Tennessee Rules of Appellate Procedure provides, in pertinent part, as follows:

> [I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived.

The Defendant makes no argument that this Court should review this issue as plain error.

-12-

Importantly, we also feel constrained to note that the defense failed to make a contemporaneous objection at trial. The trial court asked defense counsel if he wanted the juror removed immediately or to proceed on with trial perhaps later excusing her as an alternate; defense counsel agreed to let the trial court handle it as it saw fit, thereby, acquiescing to either scenario. A party may not later seek relief from an error to which he acquiesced or failed to take a reasonable action to nullify the harmful effect of the error. Tenn. R. App. P. 36(a).

Finally, as the juror was ultimately excused and did not participate in deliberations, the trial court complied with the defense's request to remove the challenged juror. Tennessee Rule of Criminal Procedure 24(f)(2) clearly contemplates the replacement of a juror with an alternate if, at any time prior to the jury's withdrawal to consider its verdict, the trial court finds the juror "to be unable or disqualified to perform [his] duties." State v. Cleveland, 959 S.W.2d 548, 551 (Tenn. 1997) (quotation omitted).[4] The determination of whether a juror is unable or disqualified to perform his duties lies within the sound discretion of the trial court. State v. Forbes, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995). We cannot determine that the trial court abused its discretion in dismissing this juror prior to the jury's withdrawal to consider its verdict. The Defendant is not entitled to relief on this issue.

## III. Sentencing

The Defendant contends that the trial court erred in setting the length of his individual sentences and in ordering him to serve consecutive sentences. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the

---

[4] Rule 24 has been amended since the Cleveland opinion. We cite to the current, relevant provision.

principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

**A. Length**

The Defendant's conduct occurred subsequent to the enactment of the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and

-14-

the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

The Defendant was convicted of one count of conspiracy to commit aggravated burglary, a Class D felony, one count of aggravated burglary, a Class C felony, one count of attempted aggravated robbery, a Class C felony, one count of aggravated rape, a Class A felony, and two counts of aggravated kidnapping, a Class B felony. See Tenn. Code Ann. §§ 39-12-101, -12-103, -12-107, -13-304, -13-402, -13-502, & -14-403. As a Range I, standard offender, the Defendant's sentencing range was two to four years for the Class D felony, three to six years for the Class C felonies, eight to twelve years for the Class B felonies, and fifteen to twenty-five years for the Class A felony. See Tenn. Code Ann. § 40-35-112(a)(1)-(4). The trial court imposed enhanced sentences of three years for the conspiracy to commit aggravated burglary conviction, five years for the aggravated burglary and attempted aggravated robbery convictions, twenty-two years for the aggravated rape conviction, and ten years for each aggravated kidnapping conviction.

In setting the length of the Defendant's sentences,[5] the trial court found one enhancement factor to be applicable to all six convictions: At the time the felony was committed, the Defendant was released on probation. See Tenn. Code Ann. § 40-35-114(13). The trial court determined that four additional factors were applicable to the Defendant's convictions for conspiracy to commit aggravated burglary, aggravated burglary, attempted aggravated robbery, and aggravated kidnapping (excluding only the aggravated rape conviction): (3) The offense involved more than one victim; (4) A victim of the offense was particularly vulnerable because of age or physical or mental disability; (5) The Defendant treated, or allowed a victim to be treated, with exceptional cruelty during the commission of the offense; and (7) The offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement. See Tenn. Code Ann. §40-35-114(3)-(5) & (7). The trial court declined to apply any mitigating factors.

On appeal, the Defendant argues that the trial court erred in applying many of these enhancement factors to his convictions. Specifically, he makes the following challenges to his sentences:

---

[5] The transcript of the sentencing hearing and the order entered by the trial court (titled "Sentencing Findings of Fact") are somewhat contradictory about what enhancement factors applied to which counts. Because the order is extremely specific and signed by the trial judge after the hearing, we are inclined to use the factors as delineated in the order.

[The Defendant] was convicted of aggravated kidnapping x2, yet the trial court found applicable to those convictions Tenn. Code Ann. § 40-35-114(3) that the offense involved more than one victim even though [the Defendant] received separate convictions for each victim.

The trial court found applicable the enhancement factor that the victim of the offense was particularly vulnerable. Tenn. Code Ann. § 40-35-114(4). This factor could have application to one of the aggravated kidnappings, but not any other convictions, particularly robbery or burglary where the minor child was not involved.

The trial court also found applicable the factor that the [Defendant] treated or allowed a victim to be treated with exceptional cruelty (Tenn. Code Ann. § 40-35-114(5)), and applied this factor to five of the six convictions. There was no reasonable application of this enhancement factor to any of the convictions other than possibly the aggravated rape.

The trial court also found applicable the factor that [the Defendant] committed the crime to gratify his own desire for pleasure or excitement. Tenn. Code Ann. § 40-35-114(7). While this may be an appropriate enhancement factor for rape, the State has the burden of demonstrating that the rape was sexually motivated and done to gratify the [D]efendant's desire for pleasure or excitement. State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). There was no proof upon the record that this was the case.

The Defendant then asks this Court to reduce his sentences accordingly.

While we agree with the Defendant, and the State concedes, that some of these enhancement factors were misapplied to the Defendant's convictions, we need not delve into a detailed analysis of the application of these enhancement factors to each specific conviction because the remaining enhancement factors the trial court found are more than sufficient to support the Defendant's sentences.

The trial court was justified in finding factor (13)—that the Defendant was on probation at the time he committed these offenses.[6] Enhancement factor (3), the offense involved more than one victim, cannot be applied when the conviction is for a crime against a specific, named victim. See State v. Imfeld, 70 S.W.3d 698, 705-06 (Tenn. 2002).

---

[6] Neither party addresses this factor on appeal, presumably because it was only applied in the sentencing order and not stated at the sentencing hearing.

Conspiracy to commit aggravated burglary and aggravated burglary do not involve a specific, named victim; thus, enhancement factor (3) applied only to those convictions. As for factor (4), the trial court properly enhanced the Defendant's sentences for conspiracy to commit aggravated burglary, aggravated burglary, and one count of aggravated kidnapping based upon a finding that the two-and-a-half-year-old child victim was particularly vulnerable as she was incapable of resisting, summoning help, or testifying against her assailants. State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). "[P]roper application of enhancement factor (5) requires a finding of cruelty under the statute 'over and above' what is required to sustain a conviction for an offense." State v. Arnett, 49 S.W.3d 250, 258-59 (Tenn. 2001) (citing State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995)); see also State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (requiring the facts in a case to "support a finding of 'exceptional cruelty' that demonstrates a culpability distinct from and appreciably greater than that incident to" the crime)). The trial court did not make a specific finding of the facts it considered to be "over and above" what is necessary to sustain a conviction for the offenses. In this case, the conspiracy to commit aggravated burglary, aggravated burglary, attempted aggravated robbery, and one aggravated kidnapping sentences are subject to enhancement via this factor. The cruelty of the rape inflicted on the victim by the Defendant demonstrate distinct and greater culpability than the cruelty inherent in kidnapping, robbery, or burglary alone. See State v. Richard Cole, III, No. W2002-02826-CCA-R3-CD, 2003 WL 22309491, at *3 (Tenn. Crim. App., Jackson, Oct. 8, 2003). Regarding enhancement factor (7), we agree with the Defendant, and the State concedes, that there is nothing in the record to support a conclusion that the Defendant committed these offense to gratify a desire for pleasure or excitement. See Arnett, 49 S.W.3d at 261-62 ("Essential to proper application of [enhancement] factor [(7)] is the determination of the defendant's motive for committing the offense.") (citing State v. Kissinger, 922 S.W.2d 482, 490 (Tenn. 1996)).[7]

While not specifically stated, the trial court discernibly placed significant weight on enhancement factor (13): At the time the felony was committed, the Defendant was on probation. See Tenn. Code Ann. § 40-35-114(13). In its sentencing order, the trial court found this as the only factor applicable to the aggravated rape conviction and still chose to enhance the sentence from fifteen to twenty-two years. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Carter, 25 S.W.3d at 344. Moreover, in addition to factor (13) which applied to all convictions, factors

---

[7] We note that the trial court did not apply this enhancement factor to the rape conviction in its sentencing order. While robbery was the apparent motive to enter the home, there were several instances of sexual conduct by the Defendant with the victim occurring on different occasions during the ordeal. The Defendant fondled the victim, penetrated the victim by inserting his penis and finger into her vagina, the victim performed fellatio on the Defendant, and the Defendant ordered the victim to perform with her vibrator.

(3), (4), and (5) were properly applied to the Defendant's sentences for conspiracy to commit aggravated burglary and aggravated burglary; factor (5) was properly applied to the Defendant's convictions for attempted aggravated robbery and one count of aggravated kidnapping (the adult victim); and factor (4) was properly applied to the other count of kidnapping (the child victim). Thus, despite the misapplication of several enhancement factors, and given the non-binding nature of enhancement factors and the discretion now afforded to trial courts under our new sentencing laws, we are inclined to affirm the sentence as imposed. We conclude that the trial court did not err or abuse its discretion in setting the Defendant's sentences at three, five, ten, and twenty-two years for his six convictions.

## B. Consecutive Sentencing

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

In State v. Wilkerson, our supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: The court must find consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. 905 S.W.2d 933, 937-38 (Tenn. 1995). Although such specific factual findings are unnecessary for the other categories enumerated in Tennessee Code Annotated section 40-35-115(b), the imposition of consecutive sentencing is also subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed," that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and that the defendant's "potential for rehabilitation" be considered. Tenn. Code Ann. § 40-35-103(2), (4) & (5).

The trial court imposed consecutive sentences based on its finding that the Defendant was being sentenced for offenses committed while on probation. See Tenn. Code Ann § 40-35-115(b)(6). The Defendant makes no significant argument that this finding is not warranted under the facts, stating only that "the record is clear that [the Defendant's] past record was made up almost entirely of driving and drug misdemeanors, not crimes of violence." The record supports the finding that the Defendant was on probation at the time he committed the underlying crimes. According to the presentence report, on October 23, 2006, the Defendant pleaded guilty in the Rutherford County Circuit Court to aggravated criminal trespass, burglary of an automobile, theft under $500, and driving on a revoked license and was placed on probation. The offenses here occurred just one month later on November 22, 2006. At the sentencing hearing, defense counsel admitted that the Defendant "was on some form of probation when this occurred." Given the severity of the offenses involved here, partial consecutive sentencing is an appropriate and justly deserved sanction. Accordingly, we affirm the trial court's imposition of consecutive sentencing.

**Conclusion**

Based on the foregoing and the record as a whole, the judgments of the Rutherford County Circuit Court are affirmed.

_____
DAVID H. WELLES, JUDGE

-19-